**Diane MANN, as Trustee for the Estate of LeapSource, Inc., et al., Plaintiffs,**

v.

**GTCR GOLDER RAUNER, L.L.C., a Delaware limited liability company, et al., Defendants.**

**No. CIV–02–2099–PHX–RCB.**

United States District Court, D. Arizona.

March 30, 2007.

Kevin Breger, The Law Offices of Kevin Breger, Leo R. Beus, Scot C. Stirling, Steven Eric Weinberger, Beus Gilbert PLLC, Scottsdale, AZ, Steven Joseph Brown, Steve Brown & Associates LLC, Phoenix, AZ, for Plaintiffs.

Merrick Brian Firestone, Veronica Lynn Manolio, Ronan & Firestone PLC, Scottsdale, AZ, Kevin A. Russell, David S. Foster, Michael J. Faris, Livia M. Kiser, Nicholas B. Gorga, Latham & Watkins LLP, Chicago, IL, Don P. Martin, Edward Alipio Salanga, Quarles & Brady LLP, Daniel P. Jensen, Law Office of Daniel P. Jensen PLLC, James R. Condo, John J. Bouma, Joseph G. Adams, Patricia Lee Refo, Todd Feltus, Snell & Wilmer LLP, Phoenix, AZ, for Defendants.

## ORDER

BROOMFIELD, Senior District Judge.

### Introduction

LeapSource, Inc. existed as a "business process outsourcing" company for less than two years.[1] LeapSource's demise engendered this litigation which has been ongoing for nearly five years (more than twice as long as the Company existed).[2] Before the court is a motion directed at 15 counts of the Fourth Amended Complaint ("FAC") (doc. 121), brought by defendants GTCR Golder Rauner, L.L.C., GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR Associates VI,[3] Joseph P. Nolan, Bruce V. Rauner, Daniel Yih, David A. Donnini and Philip A. Canfield[4] for summary judgment pursuant to Fed.R.Civ.P. 56 (doc. 347). Finding oral argument unnecessary, the court rules as follows.

### Discussion

### I. Standard of Review

The court assumes familiarity with what has sometimes been referred to as the *Celotex* trilogy wherein the Supreme Court, in 1986, clarified and refined the standards for deciding Rule 56 summary judgment motions. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538

1. On September 16, 1999, LeapSource's predecessor corporation was formed. DSOF (doc. 348) at 2, ¶ 1; *see also* PSOAF (doc. 417, pt. 2) at 2, ¶ 1. On July 11, 2001, LeapSource filed its petition for bankruptcy. *In re LeapSource, Inc.,* No. B 01–9020 PHX JMM (Bankr.D.Ariz.2001) (doc. 1).

2. The court has issued no less than nine substantive familiarity with which is assumed.

3. When necessary to distinguish among these defendants, the GTCR VI Entities shall be read as referring to the three defendant private equity funds, GTCR Fund VI, L.P., GTCR VI Executive Fund and GTCR Associates VI. GTCR shall be read as referring to GTCR Golder Rauner, LLC, the general partner of GTCR Partners VI, L.P., which, in turn, is the general partner of the GTCR VI Entities.

4. Unless necessary to distinguish among them, hereinafter "the GTCR defendants" and "GTCR" shall be read as referring to GTCR, the GTCR VI entities, as well as any or all of the individual GTCR principals, Rauner, Nolan, Yih, Donnini, and Canfield.

(1986). There is no need to repeat the entire body of summary judgment case law which has developed since then, but a few principles are worth highlighting.

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is beyond dispute that "[t]he moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.2007) (citation omitted). "Once the moving party meets its initial burden, . . ., the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citations omitted). This "[e]vidence must be concrete and cannot rely on 'mere speculation, conjecture, or fantasy.'" *Bates v. Clark County*, 2006 WL 3308214, at * 2 (D.Nev. Nov.13, 2006) (quoting *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986)). Similarly, uncorroborated and self-serving testimony or declarations, without more, will not create a genuine issue of material fact precluding summary judgment. *See DuBois v. Ass'n Apart. Owners 2987 Kalakaua*, 453 F.3d 1175, 1180 (9th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 1267, 167 L.Ed.2d 92, 75 USLW 3436 (2007).

Nor will "a mere 'scintilla' of evidence" be sufficient "to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v.*

*City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir.1997) (quoting *Anderson*, 477 U.S. at 249, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202). Thus, in opposing a summary judgment motion it is not enough to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citations omitted).

By the same token though, when assessing the record to determine whether there is a "genuine issue for trial," the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inference in his favor." *Horphag*, 475 F.3d at 1035 (citation omitted). The court may not make credibility determinations; nor may it weigh conflicting evidence. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. It is with these standards firmly in mind that the court has examined, at length, the record as presently constituted.

Before addressing the merits, the court has a few preliminary observations. Most importantly, plaintiffs' response memorandum is substantially lacking in terms of citations to the record. Their 40 page response includes cites to only 11 paragraphs of plaintiffs' 106 page, 261 paragraph PSOAF. Further, plaintiffs twice designated deposition testimony by page and line, but elected not to correlate that testimony to any specific exhibit in the record. And although plaintiffs incorporate by reference memoranda filed in earlier motions, they did not indicate which pages are relevant to the issues *now* before the court. These omissions would be problematic in any case, but they are especially so here where the record consists of over 140 exhibits, totaling approximately 2500 pages.[5] Perhaps these omissions

5. To put the length of this record in perspective, Leo Tolstoy's *War and Peace* is "typically over 1400 pages as a paperback." http://en. wikipedia.org/wiki/List—of—longest—novels (last visited March 7, 2007).

simply indicate that much of the record does not support plaintiffs' position, and they have done the best possible with the facts and law available.

As the Ninth Circuit has acknowledged on more than one occasion though, a court does not have an obligation to "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.) (internal quotations and citations omitted) ("[It] is not our task to scour the record in search of a genuine issue of triable fact."); *Forsberg v. Pacific N.W. Bell Tel. co.*, 840 F.2d 1409, 1418 (9th Cir.1988) (A district court is not "required to comb the record to find some reason to deny a motion for summary judgment[.]"). That is so because courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279 (internal quotation marks and citations omitted). Or, as the Ninth Circuit so succinctly put it in *Carmen:*

> A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search unassisted by counsel, through the entire record, to look for such evidence.

*Carmen*, 237 F.3d at 1030; *see also Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992) ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the nonmoving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wa-

gered.") In short, nothing in Rule 56 or the case law construing it, requires the court to consider matters not specifically brought to its attention. Accordingly, as is its prerogative, here the court has " 'limit[ed] its review to the documents submitted for purposes of summary judgment and *those parts of the record specifically referenced therein.*' " *Hubbard v. 7–Eleven, Inc.*, 433 F.Supp.2d 1134, 1140 (S.D.Cal. 2006) (quoting *Carmen*, 237 F.3d at 1030) (emphasis added).

This insufficient identification of those facts which plaintiffs believe defeat defendants' summary judgment motion is compounded by the fact that frequently in their response plaintiffs relied more upon rhetoric than reason. Indeed, in discussing some issues, for example, aiding and abetting of fiduciary breaches, plaintiffs did not cite to any case law at all. When it was difficult to discern the exact nature of plaintiffs' opposition argument, the court did not speculate because to do so would mean that it would be impermissibly taking on the role of advocate, rather than impartial decision-maker. Again, however, the court assumes that plaintiffs provided the court with such citations to the record as were available to them.

## II. Fiduciary Duties

For discussion purposes, the remaining counts in the FAC can be divided into two broad categories—those alleging breach of fiduciary duties (and the aiding and abetting of those breaches), as well as six remaining miscellaneous counts. The fiduciary duty claims can be further divided into those brought by plaintiff Dianne Mann, as bankruptcy trustee (counts 2, 4, 5, 6 and 7), and those brought by the eight individual plaintiffs, former LeapSource employees (counts 17–20).

### A. Scope

■ As it did in its September 30, 2003, dismissal order, the court will once again look to Delaware law, the state of Leap-Source's incorporation, to assess the viability of plaintiffs' fiduciary duty claims. *See Mann I* (doc. 72) at 42 (citing *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)). Delaware law recognizes that not only do directors and officers "stand in a fiduciary relationship to their corporation and stockholders[,]" but "a majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation." *Matter of Reading Co.*, 711 F.2d 509, 517 (3rd Cir.1983) (citations omitted); *see also In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del.Ch.1995) ("A shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation and its minority shareholders.") Consistent with that view, plaintiffs allege separate breaches of fiduciary duties by the GTCR Entities as "majority shareholders of Leap-Source," doc. 121 at 75, ¶ 325 (count 2); and at 95, ¶ 444 (count 17); and separately by defendants Nolan, Rauner, Donnini, and Yih [6] as "directors and officers of LeapSource." *Id.* at 78, ¶ 345 (count 5); and at 98, ¶ 455 (count 19). Further, plaintiffs generally allege that these defendants owed them a host of fiduciary duties: "good faith, fair dealing, candor, loyalty, due care, and full and fair disclosure."

*See, e.g., id.* at 79, ¶ 346; and 95 at ¶ 444. These claimed breaches of fiduciary duties occurred in a variety of ways, ranging from "engaging in the fraudulent transfer of valuable assets[ ]" to "placing ... [LeapSource] in bankruptcy liquidation." *See id.* at ¶ 446.

Despite the broad scope of the breach of these fiduciary duty counts, defendants frame their summary judgment motion strictly in terms of the duties of loyalty and due care. This is in accordance with Delaware law which identifies loyalty and due care as the two "traditional" fiduciary duties. *See In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 475 (Del.Ch.2000); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993) (citation omitted)("Duty of care and duty of loyalty are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders.") "Each of these duties is of equal and independent significance." *Cede*, 634 A.2d at 367. The other fiduciary "duties" which plaintiffs claim were owed them are subsumed in the duties of loyalty and due care. For example, in *Stone v. Ritter*, 911 A.2d 362 (Del.2006), the Delaware Supreme Court clarified that "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does *not* establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty." *Id.* at 370 (footnote omitted) (emphasis added). For that reason, "[o]nly the latter two duties, where violated, may directly result in lia-

---

**6.** Michael Makings, a former LeapSource employees also is named as a defendant in this cause of action, as well as a number of other counts in the FAC. Defendant Makings has separately moved for summary judgment (doc. 340). His motion is the subject of a separate order which is being issued contemporaneously herewith.

David Eaton was also a defendant in this count, as well as in other counts, but the parties entered into a stipulation of dismissal with respect to all counts against him.

bility, whereas a failure to act in good faith may do so, but indirectly." *Id.*

Likewise, "the ... fiduciary duty of disclosure, ..., is not an independent dut[y] but the application in a specific context of the ... fiduciary duties of care, good faith, and loyalty." *Malpiede v. Townson,* 780 A.2d 1075, 1086, (Del.2001) (footnote omitted); *Stroud v. Grace,* 606 A.2d 75, 84 (Del.Supr.1992) ("[I]t is more appropriate ... to speak of a duty of disclosure [which is subsumed in the traditional duties] ... rather than the unhelpful terminology that has crept into Delaware court decisions as a 'duty of candor.' ") Therefore, it is logical to assume that to the extent there may be a duty of "fair dealing," as plaintiffs allege, it too is subsumed in the primary duties of loyalty and due care.

The import of the foregoing is that if defendants prevail on their motion for summary judgment with respect to the alleged breaches of the fiduciary duties of due care and loyalty, then they would be entitled to summary judgment with respect to all counts alleging breaches of fiduciary duty, regardless of how those duties are defined. This is especially so given that plaintiffs devote their opposition almost exclusively to arguing that defendants did not act in good faith as a means of rebutting the business judgment rule, as opposed to showing a separate and independent breach of such a duty.

### B. Standing

The GTCR defendants advance several arguments as to why they are entitled to summary judgment with respect to the fiduciary duty claims (counts 17–20). The first argument is lack of standing and is

directed solely at the individual plaintiffs, as opposed to the plaintiff trustee.[7] If, as defendants assert, the individuals lack standing, then the court would not have jurisdiction to consider their fiduciary duty claims. *See KB2S, Inc. v. City of San Diego, California,* 2007 WL 173858, at *1 (S.D.Cal. Jan.17, 2007) ("Article III standing is necessary for federal court jurisdiction.") Given the jurisdictional nature of standing, as did the defendants, the court will address this argument first.

"Article III standing must be determined as a threshold matter in every federal case."[8] *United States v. 5208 Los Franciscos Way, LA, Cal.,* 385 F.3d 1187, 1191 (9th Cir.2004) (citation omitted). "The Constitution's case-or-controversy limitation on federal judicial authority is the lynch pin for standing ... jurisprudence." *United States v. Lazarenko,* 476 F.3d 642, 649 (9th Cir.2007) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). At its core, "[t]he standing doctrine determines 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' " *Id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). There are two components to standing—one "rooted in the Constitution's case-or-controversy requirement," and the other "a prudential component, which embraces judicially self-imposed restraints on federal jurisdiction." *Id.* (citing, *inter alia, Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004)). "A litigant must satisfy both [components] to seek

---

**7.** Hereinafter in this section "plaintiffs" shall be read as referring to the individual plaintiffs—not to the plaintiff trustee.

**8.** Even though the FAC includes only state law based claims, because this action is "re-

lated to" the LeapSource bankruptcy proceeding, this court has "original but not exclusive jurisdiction" pursuant to 28 U.S.C. § 1334(b), making this a "federal case."

redress in federal court." *Id.* (citation omitted).

■ "Article III's standing requirements are familiar[.]" *Nuclear Inf. & Res. v. Nuclear Reg. Com'n.*, 457 F.3d 941 (9th Cir.2006). A plaintiff must show:

> (1) it has suffered an 'injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 949 (internal quotation marks and citations omitted). In addition to meeting those criteria, a plaintiff "must also meet non-constitutional or prudential requirements to invoke federal jurisdiction." *Lazarenko*, 476 F.3d at 649. "Prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' " *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court reiterated that "[t]he party invoking federal jurisdiction bears the burden of establishing [the standing] elements." *Id.* at 561, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (citing, *inter alia, Warth*, 422 U.S. at 508, 95 S.Ct. 2197, 45 L.Ed.2d 343). As the *Lujan* Court made clear, because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted). Thus, while "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, ... [i]n response to a summary judgment motion, ..., the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed.R.Civ.P. 56(c)); *see also Bras v. California Public Utilities Commission*, 59 F.3d 869, 874 (9th Cir.1995) ("In deciding whether [plaintiff] has ... standing, we must consider the allegations of fact contained in [plaintiff's] declaration and other affidavits in support of his assertion of standing.")

■ The fact of removal does not change plaintiffs' burden as to standing at this point in the litigation. Thus, even if plaintiffs had doubts as to their standing upon removal from state to district court, "as the party asserting federal jurisdiction when it is challenged," plaintiffs must "make the showings required for standing." *See DaimlerChrysler Corp. v. Cuno,* — U.S. ——, —— n. 3, 126 S.Ct. 1854, 1861 n. 3, 164 L.Ed.2d 589 (2006).

Initially the GTCR defendants took the position that because the fiduciary duty claims are being brought by plaintiffs "as minority shareholders," FAC (doc. 121) at 95, ¶ 443; and at 98, ¶ 456, and because these claims "are premised upon direct harm to the corporation" in the form of decreased stock value, these are derivative claims which can only be brought by the plaintiff trustee. See Mot. (doc. 347) at 9.

■ The foregoing argument conforms to the plain language of the FAC, wherein plaintiffs allege that they are bringing these fiduciary duty claims as "minority shareholders[.]" FAC (doc. 121) at 95,

¶ 443; and at 98, ¶ 456. In responding to GTCR's standing argument, plaintiffs shifted gears however. Now plaintiffs maintain that they are pursuing these claims as "creditors of LeapSource[,]" and as such they, as well as the trustee, have standing. *See* Resp. (doc. 417) at 7. Citing to *Production Resources Group, L.L.C. v. NCT Group Inc.*, 863 A.2d 772 (Del.Ch. 2004), plaintiffs contend that they "have standing to complain of the breaches of fiduciary duties owed to the creditors of LeapSource when it was insolvent or in the zone of insolvency."[9] *Id.* According to plaintiffs, their standing derives from their status as "creditors" who have "suffered . . . individualized damages, apart from the losses sustained as shareholders including claims for unpaid bonuses[10] and severance payments." *Id.* (footnote added).

Regardless of whether plaintiffs are bringing these fiduciary duty claims "as shareholders or 'creditors,'" in their reply, defendants stress that these claims are derivative. *See* Reply (doc. 449) at 9. Given the derivative nature of the fiduciary duty claims, GTCR adheres to its position that "only . . . the trustee[ ]" has standing to assert them. *Id.* As further support for its argument that the fiduciary duty counts are derivative, in its reply GTCR relied upon *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 2006 WL 846121 (Del.Ch. Mar.28, 2006), an unpublished opinion. The court in *Big Lots*, found that "[s]horn of excess verbiage, Big Lots's fundamental complaint . . . is that the defendants caused HCC to become insolvent through what amounted to breaches of fi-

duciary duty." *Id.* at *7. Quoting from the *Production Resources*, the *Big Lots* court found that "claims of th[at] type [we]re classically derivative[,]" and thus could not "be maintained by Big Lots in this proceeding." *Id.* at *7 (quotation marks, citation and footnote omitted); and at *8 (footnote omitted). The court did note, however, that if "Big Lots [had] pleaded facts which establish a direct claim, such as those in *Production Resources*, both the bankruptcy estate and Big Lots could have brought claims arising out of the same facts[,]" but it did not. *See id.* at *8 n. 54.

As an unpublished decision, in accordance with Rule 171(h) of the Court of Chancery of the State of Delaware, a copy of *Big Lots* should have been attached to GTCR's reply, but it was not. For that reason, and to allow plaintiffs to address the potential applicability of *Big Lots* to the present action, the court ordered plaintiffs to file a sur-reply (doc. 468), which they did (doc. 469). Defendants were given an opportunity to respond, which they also did (doc. 470).

■ "[I]t is settled under Delaware law," as plaintiffs suggest, that "[w]hen a firm has reached the point of insolvency, . . . the firm's directors . . . owe fiduciary duties to the company's creditors." *Production Resources*, 863 A.2d at 790–91 (footnote omitted); *see also Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch.1992) (directors of insolvent corporation have a fiduciary duty to act for the benefit of corporate creditors). In fact, as

---

**9.** "Standing is measured at the time the complaint is filed." *Hubbard*, 433 F.Supp.2d at 1141 (citation omitted). Here, the FAC was filed on June 11, 2004. The first amended complaint, which was the basis for removal to this district court on October 21, 2002, was filed on July 31, 2002. Thus, regardless of which filing date the court uses, because LeapSource filed its bankruptcy petition on

July 11, 2001, clearly it was insolvent "at the time the complaint [wa]s filed[,]" *see id.;* and the parties are not disputing that. *See* Resp. (doc. 417) at 6.

**10.** There are no allegations in counts 17–20 that plaintiffs were injured because they were not paid bonuses.

the court in *Production Resources* observed, "[t]his is an uncontroversial proposition and does not completely turn on its head the equitable obligations of the directors to the firm itself." *Id.* at 791 (footnote omitted). What is less clear however is whether those creditors' claims are direct or derivative. This is an important distinction here because GTCR and the plaintiffs have opposing views. GTCR maintains that the plaintiffs' claims are derivative, and hence they lack standing, whereas, plaintiffs argue that the direct nature of their fiduciary duty claims gives them standing.

■ "Whether an action is derivative or direct is usually a question of state law." *Abrahamson v. Western Savings and Loan Association,* 1994 WL 374294, at *3 (D.Ariz. Jan.24, 1994) (citing, *inter alia, In re Sunrise Sec. Litig.,* 916 F.2d 874, 881 (3rd Cir.1990)). And, as mentioned at the outset, Delaware law governs the breach of fiduciary duty claims herein. *See Mann I* (doc. 72) at 42(citation omitted). "Aiming at clarification in light of confusing jurisprudence on the direct/derivative dichotomy," *In re Enron Corp. Securities, Derivative and "ERISA" Litigation,* 2005 WL 2230169, at *1 (S.D.Tex. Sept.12, 2005) (internal quotation marks omitted), the Delaware Supreme Court in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031 (Del.2004), "discarded the old 'special injury' test, i.e. whether the plaintiff has suffered an injury different from that suffered by shareholders in general, for determining whether a claim is direct or derivative." *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004) (footnote omitted); *see also Albert v. Alex. Brown Management Services, Inc.,* 2005 WL 2130607, at *12 (Del.Ch. Aug.26, 2005) (In *Tooley,* the Supreme Court of Delaware "revised the standard for determining whether a claim is direct or derivative.") After *Tooley,* "the proper analysis" for distinguishing between direct and deriva-

tive claims requires a court to examine "the nature of the wrong and to whom the relief should go." *Tooley,* 845 A.2d at 1039. More specifically, the Tooley Court held that the issue of "whether the complaint alleges a direct or derivative claim . . . must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

In analyzing the first prong, the Delaware Supreme Court found "helpful" the Chancellor's approach, which was to "[l]ook[ ] at the body of the complaint and consider[ ] the nature of the wrong alleged and the relief requested[.]" *Id.* at 1036 (internal quotation marks omitted). From there, the question becomes whether "the plaintiff [has] demonstrated that he or she can prevail without showing any injury to the corporation[.]" *Id.* (internal quotation marks and footnote omitted). "The second prong of the analysis should logically follow[,]" opined the *Tooley* Court. Stated somewhat differently, the Delaware Supreme Court in *Tooley* stressed that "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* at 1039. "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.*

Applying the two prong *Tooley* test, GTCR asserts that plaintiffs' claims fail under the first prong in that they cannot prevail on the fiduciary duty counts "without showing an injury to the corporation[.]" Resp. (doc. 470) at 2 (internal quotation marks omitted). Indeed, GTCR is quick to point out that as plaintiffs' themselves describe their theory, "GTCR reacted angrily and destructively [to their

criticism], and in less than a month Leap-Source was destroyed." *Id.* (internal quotation marks and citation omitted). As GTCR views it "[t]hese are classically derivative claims, belonging solely to the Trustee." *Id.* Consequently, the individual plaintiffs lack standing.

Overlooking *Tooley,* in their sur-reply plaintiffs argue that they have standing because their damages "fall within the class of cases, contemplated by the court in Production Resources and acknowledged by the court in *Big Lots,* where the claims of particular creditor plaintiffs are based at least in part upon conduct **aimed specifically at those plaintiffs,** and motivated by animus that is **not** common to all creditors (or to all shareholders)." Sur-Reply (doc. 469) at 5 (emphasis in original). Originally, plaintiffs did not indicate whether they were seeking to bring direct or derivative fiduciary duty claims. Their sur-reply clarifies that they are attempting to assert direct breach of fiduciary duty claims.

Plaintiffs' heavy reliance upon *Production Resources,* combined with the fact that that court "stressed multiple times the unusual and particularized facts that gave rise to its holding[,]" *Fleet National Bank v. Boyle,* 2005 WL 2455673, at *14 (E.D.Pa. Sept.12, 2005), warrants a close examination of those facts. In concluding that the creditor's direct breach of fiduciary duty claim survived a motion to dismiss, the *Production Resources* court was persuaded by several factors. First, and perhaps foremost, the plaintiff in Production Resources had obtained a $2 million judgment against the defendant, a judgment which plaintiff had been seeking to collect for approximately five years with little success. Second, the defendant's actions in *Production Resources* all took place after it became insolvent. Third, the challenged conduct there included allegations that the defendant breached "specific promises

made to [the judgment creditor] and [it] ... t[ook] steps to accept new capital in a manner that was intentionally designed to hinder [the judgment creditor's] effort to obtain payment." *Id.* at 800 (emphasis added). In other words, the board took "particular steps to disadvantage PRG as a creditor and to frustrate its efforts at collection." *Id.* Finally, as the court in *Big Lots* so aptly put it, "[i]n the face of such extraordinary machinations, the [*Production Resources*] court was unwilling to dismiss the creditor's claims of specific injury as derivative because it seemed possible that the creditor in question was the only one that had been injured, and was thus the only one to which recovery was due." *Big Lots,* 2006 WL 846121, at *7.

■ Production Resources stands in sharp contrast to the present case. Even viewing the evidence in a light most favorable to plaintiffs, and drawing all reasonable inferences in their favor, as the court must, it cannot find that plaintiffs' fiduciary duty claims fall within the narrow category of direct claims recognized in *Production Resources.* This is not a situation, such as *Production Resources,* where plaintiffs are judgment creditors who have been seeking to collect a debt owed to them for a number of years. Rather, the plaintiffs herein are "creditors holding unsecured priority claims[,]" in the related bankruptcy proceeding. *See* PSOAF (doc. 417–18), exh. 29 thereto. This is a significant distinction because as the court in *Big Lots* astutely observed, "[t]he immediacy of the *Production Resources* defendant's debt was a necessary underpinning of th[at] court's find that the debtor's recalcitrance might have been motivated by targeted animus towards the plaintiff." *Id.* (footnote omitted). In fact, in *Big Lots* the court distinguished *Production Resources* because, among other things, the plaintiff in *Big Lots* "had no right to repayment of its debt at the time of the challenged

transaction." *Big Lots*, 2006 WL 846121, at *7. The same is true of the individual plaintiffs herein.

Furthermore, also in sharp contrast to *Production Resources*, it is plaintiffs' theory that the GTCR defendants' breaches of fiduciary duties caused LeapSource's insolvency, not that LeapSource was insolvent at the time of the alleged breaches. In addition, unlike *Production Resources*, there is not "a marked degree of animus [here] towards a particular creditor with a proven entitlement to payment[.]" *Production Resources*, 863 A.2d at 798 (footnote omitted). "In March 2001, [LeapSource] attempted to negotiate reductions in severance obligations for terminated employees." DSOF (doc. 348) at 15, ¶ 100 (citations omitted); PSOAF (doc. 417, pt. 2) at 55, ¶ 100. Other terminated employees, but not plaintiffs, "agreed to execute . . . releases in return for partial severance payments." *Id.* at 15, ¶ 102 (citations omitted); *id.* at 56, ¶ 102. Plaintiffs decided to pursue another avenue. They filed claims in the LeapSource bankruptcy proceeding. PSOAF (doc. 417, pt. 2) at 106, ¶ 261 (citing exh. 29); Def. Resp. PSOAF (doc. 450) at 70, ¶ 216. Thus, despite how plaintiffs attempt to depict it, they were not treated differently than others. They simply chose a different option than did the employees who elected to sign a release. This similar treatment further weakens plaintiffs' argument of animus directed **"specifically"** at them. *See* Sur–Reply (doc. 469) at 5 (emphasis in original).

Not only that, in *Production Resources* there were allegations that the defendants were intentionally hindering the judgment creditor's collection efforts, and "engaging in preferential treatment of the company's primary creditor[.]" *See Production Resources*, 863 A.2d at 800 (footnote omitted). There are no such allegations or proof of similar conduct by the GTCR defendants.

Given the significant factual distinctions between *Production Resources* and the present case, the latter does not mandate the conclusion that plaintiffs' fiduciary duty claims are direct, and thus they have standing.

There are several other compelling reasons to find that these fiduciary duty claims are derivative, and hence plaintiffs lack standing to bring them. The first is that on a continuum, the present case falls far closer to *Big Lots* (defendants' primary support) than it does to *Production Resources*. Just as in *Big Lots*, plaintiffs' "fundamental complaint" here is that the defendants caused LeapSource "to become insolvent through what amounted to breaches of fiduciary duty." *See Big Lots*, 2006 WL 846121, at *7. The present case is no different than *Big Lots* where the court soundly reasoned:

> [T]he underlying infirmity of the complaint is that the unavoidable effect of granting relief would be to unfairly advantage the plaintiff, an unsecured creditor, over any number of other unsecured creditors having claims in the bankruptcy. Simply put, this case stands for the well-established proposition that derivative claims cannot be used by a single creditor to upset the structured bankruptcy process. That principle equally applies when a plaintiff has erroneously characterized various derivative claims as direct, in the hope of escaping the broad jurisdiction of the bankruptcy court and the proceedings therein.

*Id.* This is precisely what the individual plaintiffs are seeking to do through their fiduciary duty claims in this case. They are seeking to circumvent the bankruptcy process. The court cannot condone this strategy. On this point, the court agrees with the GTCR defendants. These "employee/creditor claims belong . . . in the bankruptcy court, where the . . . plaintiffs

can recover alongside other creditors in the bankruptcy process." Resp. (doc. 470) at 2.

Application of the two prong *Tooley* test provides further support for a finding that plaintiffs' fiduciary duty claims are not direct. Their claimed injuries are not independent of the alleged injuries to Leap-Source. Indeed the alleged fiduciary duties, with one exception,[11] all pertain directly to LeapSource. Those alleged breaches run the gamut from defendants "refus[al] to fully fund LeapSource with $65 million, as promised[ ]" to "preventing LeapSource from meeting its budgetary and business plan objectives[,]" culminating in an allegation that defendants "plac[ed] [LeapSource] in bankruptcy liquidation." FAC (doc. 121) at 96, ¶ 446. Certainly plaintiffs' claimed direct injury, not receiving their severance payments due to LeapSource's insolvency, is not "independent of any alleged injury" to Leap-Source, as Tooley requires. *See Tooley,* 845 A.2d at 1039. Stated somewhat differently, these plaintiffs cannot, as *Tooley* also requires, demonstrate that they "can prevail without showing an injury to" LeapSource. *See id.* In short, these are "classically derivative" claims "in the sense that they involve an injury to [Leap-Source] as an entity and any harm to the stockholders and creditors is purely derivative of the direct financial harm to [Leap-Source] itself." *Big Lots,* 2006 WL 846121

at *7 n. 46 (internal quotation marks and citation omitted). These derivative claims, as the *Big Lots* court cogently explained, "do not become direct simply because they are raised by a creditor, who alleges that the breaches of fiduciary duty caused it specific harm by preventing it from recovering a debt outside of bankruptcy." *See id.* at *7.

To conclude, because plaintiffs have not shown a direct injury independent of any injury to LeapSource, but instead have only shown a derivative loss, they do not have standing to pursue the breaches of fiduciary duty claims alleged in counts 17 and 19. It stands to reason then, that if plaintiffs lack standing to pursue those counts, they also lack standing to pursue the counts for aiding and abetting those breaches (counts 18 and 20). Therefore, the court grants the GTCR defendants' motion for summary judgment as to counts 17–20.

### C. Duty of Loyalty

With one exception,[12] it is impossible to discern from the 106 page, 486 paragraph FAC exactly what transaction or transactions form the basis for the alleged duty of loyalty breaches. Therefore, as a consequence, the GTCR VI Entities looked to plaintiffs' answers to interrogatories. Based upon those answers, the Entities identified "four areas of alleged misconduct . . .:(1) nondisclosure [13] regarding the

---

**11.** The exception is plaintiffs' claim that defendants breached their fiduciary duties "by terminating [them] and by refusing to fully pay each of them annual severance upon their terminations without cause[.]" FAC (doc. 121) at 96, ¶ 446; and at 99, ¶ 459.

**12.** Count 2 (the trustee's breach of fiduciary duty claim against the GTCR entities) specifically alleges that those Entities "breach[ed] their duty of loyalty by dissipating or diverting assets of LeapSource for the benefit of themselves, other Defendants, or certain pre-

ferred creditors[.]" FAC (doc. 121) at 75, ¶ 327.

**13.** Under some circumstances Delaware law recognizes a fiduciary duty of disclosure, although as previously mentioned, not independent of the duties of due care and loyalty. *Malpiede,* 780 A.2d at 1086. Thus, to avoid confusion, because what plaintiffs are actually claiming is that the GTCR Entities breached their duty of loyalty by discontinuing funding, when analyzing this particular claim, the court will not refer to "non-disclosure," even though the parties do.

funding cutoff; (2) interference with management; (3) interference with the company's sale; and (4) improper disposition of company assets." Mot. (doc. 347) at 14–15 (footnote added). Plaintiffs disagree with this "characterization" as to "nondisclosure[,]" but not with the fact that they are claiming that the GTCR Entities breached their duty of loyalty by deciding to discontinue funding LeapSource. *See* Resp. (doc. 417) at 17. Likewise, plaintiffs agree that the other alleged areas of misconduct just enumerated constitute the bases for their breach of the duty of loyalty counts. The court will limit its analysis accordingly.

■■■ Delaware law does not permit "[c]orporate officers and directors ... to use their position of trust and confidence to further their private interests." *In re Greater Southeast Community Hospital Corp.*, 353 B.R. 324, 344 (Bankr.D.D.C. 2006) (internal quotation marks and citation omitted) (applying Delaware law). "Instead, the best interest of the corporation and its shareholders [must] take precedence over any interest possessed by a director, officer[,] or controlling shareholder and not shared by the shareholders generally." *Id.* (internal quotation marks and citation omitted). "For that reason, Delaware law distinguishes between the duty of loyalty and the duty of care." *Id.* (internal quotation marks and citation omitted).

■■■ "[C]lassic example[s]" of breaches of the duty of loyalty are "when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." *Id.* (internal quotation marks and citation omitted). However, "the fiduciary duty of loyalty is *not* limited to cases involving a financial or other cognizable fiduciary conflict of interest." *Stone*, 911 A.2d at 370(emphasis added); *see also In re Walt Disney Company Derivative Litigation*, 906 A.2d 27,

66 (Del.2006) ("[T]he universe of fiduciary misconduct is not limited to either disloyalty in the classic sense (*i.e.*, preferring the adverse self interest of the fiduciary or of a related person to the interest of the corporation) or gross negligence.") The duty of loyalty is not so limited because, as the Delaware Supreme Court explained in *Disney*:

> Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined)but is qualitatively more culpable than gross negligence, should be proscribed.

*Disney*, 906 A.2d at 66. The "doctrinal vehicle" to address "such violations ... is the duty to act in good faith." *Id.* Thus, the duty of loyalty "also encompasses cases where the fiduciary fails to act in good faith." *Stone*, 911 A.2d at 370. The rationale, as set forth by the *Stone* Court is that "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Id.* (internal quotations and citation omitted).

The Delaware Supreme Court has "identified the following examples of conduct that would establish a failure to act in good faith[,]" and in turn a breach of the duty of loyalty:

> 'where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act,

demonstrating a conscious disregard for his duties.'

*Stone,* 911 A.2d at 369 (quoting *Disney,* 906 A.2d at 67). The *Disney* Court acknowledged that "[t]here may be other examples of bad faith ..., but these three are the most salient." *Disney,* 906 A.2d at 67 (footnote omitted).

Basically, the GTCR Entities are taking the position that the business judgment rule presumption, discussed below, entitles them to summary judgment on the breach of loyalty counts. Although not articulated in precisely this way, plaintiffs respond that they have successfully rebutted that presumption because they have shown genuine issues of material fact as to whether defendants acted in good faith. Regardless of which of the purported breaches of loyalty is at issue, GTCR counters that "[b]ecause neither GTCR nor any of its director designees stood on both sides of a challenged transaction, and because GTCR—LeapSource's single largest shareholder—stood to gain or lose in the same way as all other shareholders did from LeapSource's success or failure, plaintiffs cannot satisfy their burden" of rebuttal. Reply (doc. 449) at 13 (citation omitted).

▆ After *Disney,* GTCR's counter-argument is unavailing. A breach of loyalty claim is not dependent upon a showing of self-dealing or a showing that a fiduciary "received a personal benefit not shared by all shareholders." *See Greater Southeast Community Hospital,* 353 B.R. at 344 (internal quotation marks and citation omitted). *Disney* leaves no room for doubt; it is possible under Delaware law to find a lack of good faith, and in turn a violation of the duty of loyalty, even outside the "classic" breach of loyalty situations just described. Therefore, the court will turn to the remaining and critical issue—whether plaintiffs have successfully rebutted the business judgment rule with respect to

each of the alleged breaches of loyalty. Before engaging in such an analysis, however, it is necessary to define the contours of that rule, which at times is easier stated than applied.

### 1. Business Judgment Rule

▆ Essentially the GTCR defendants' position is that the business judgment rule entitles them to summary judgment as to the fiduciary duty counts. The business judgment rule is "[t]he default standard" of judicial review "[w]hen directors are subjected to litigation for breach of the duties owed a corporation or, by virtue of insolvency, its creditors[.]" *Growe v. Bedard,* 2004 WL 2677216, at \*8 (D.Me. Nov.23, 2004) (applying Delaware law). The business judgment "rule" actually " 'is a presumption that in making a business decision the directors [and officers] of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company [and its shareholders].' " *Greater Southeast Community Hospital,* 353 B.R. at 343 n. 26 (quoting, *inter alia, Emerald Partners v. Berlin,* 787 A.2d 85 90 (Del.2001)). As with most rules of law, there are exceptions to the business judgment rule. First, it does not apply if "directors ... appear on both sides of a transaction [ ] or expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (citations omitted), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

▆ Second, as its name indicates, the business judgment rule only applies where a judgment has been made. "Technically speaking, it has no role where directors have either abdicated their func-

tions, or absent a conscious decision, failed to act." *Id.* at 813 (footnote omitted). By the same token though, "a conscious decision to refrain from acting may ... be a valid exercise of business judgment and enjoy the protections of the rule." *Id.* Third, and perhaps most significant in terms of the present motion, the business judgment rule will not shield a director from liability if that director did not act in good faith. *See Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988) (citations omitted) ("[G]ood faith and the absence of self-dealing are threshold requirements for invoking the [business judgment] rule."), *overruled on other grounds, Brehm,* 746 A.2d 244.

 The business judgment rule has both a procedural and a substantive component. "As a procedural rule, the business judgment presumption is a rule of evidence that places the *initial burden of proof* on the *plaintiff.*" *Emerald Partners,* 787 A.2d at 90 (internal quotation marks and footnote omitted) (emphasis added). "To rebut the rule, a plaintiff must provide evidence that the directors, in reaching a challenged decision, breached their fiduciary duties to the corporation or its shareholders." *Growe,* 2004 WL 2677216, at *8 (citing *Cede,* 634 A.2d at 361). "Among the kind of evidence that may suffice to rebut the business judgment rule is evidence that the defendant directors abdicated their duties." *Id.* (citing, *inter alia, Cede,* 634 A.2d at 363). Because the business judgment rule is a "powerful presumption," *Cede,* 634 A.2d at 361, it can only be "rebutted in those *rare* cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Parnes v. Bally Entertainment Corp.,* 722 A.2d 1243, 1246 (Del.1999) (internal quotations and citation omitted) (emphasis added).

 "The Delaware Supreme Court has defined 'bad faith' as 'not simply bad judgement or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *Roselink Investors, L.L.C. v. Shenkman,* 386 F.Supp.2d 209, 221 (S.D.N.Y.2004) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208 n. 16 (Del.1993)). A presumption of good faith may be created by "the absence of significant financial adverse interest ..., although the good faith requirement further demands an *ad hoc* determination of the board's motives in making the business decision." *Id.* (internal quotation marks and citation omitted). Stated somewhat differently, "[i]rrationality is the outer limit of the business judgment rule." *Brehm,* 746 A.2d at 264. "Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." *Id.* (footnote omitted).

 "If a shareholder plaintiff fails to meet this [initial] evidentiary burden, the business judgment rule operates to provide substantive protection for the directors and for the decisions that they have made." *Emerald Partners,* 787 A.2d at 91 (footnote omitted). As the foregoing shows, the business judgment " 'rule posits a powerful presumption in favor of actions taken by the director [and officers] in that a decision made by a loyal and informed board [and the corporation's officers] will not be overturned by the courts unless it cannot be "attributed to *any* rational business purpose." ' " *Greater Southeast Community Hospital,* 353 B.R. at 343 n. 26 (quoting *Cede,* 634 A.2d at 361) (empha-

sis added). Or, as this court succinctly observed in its September 30, 2003 dismissal order: The business judgment "presumption is a hurdle that must be cleared before a court will second-guess the corporate decisionmaking of officers and directors." *Mann I* (doc. 72) at 43. "Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm,* 746 A.2d at 264 n. 66. As the foregoing demonstrates, "[o]vercoming the presumptions of the business judgment rule on the merits is a near Herculean task." *In re: Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir.2005) (applying Delaware law).

█ On the other hand, "[i]f the presumption of the business judgment rule is rebutted, ..., the burden shifts to the director defendants to prove to the *trier of fact* that the challenged transaction was 'entirely fair' to the shareholder plaintiff." *Emerald Partners,* 787 A.2d at 91 (internal quotation marks and footnote omitted). This "[b]urden shifting does not create *per se* liability[.]" *Cinerama Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995) (citation omitted). "Rather, it is a procedure by which Delaware courts of equity determine under what standard of review director liability is to be judged." *Id.* (internal quotation marks and citation omitted). A logical corollary of the foregoing is that in the context of a summary judgment motion such as this, if the plaintiffs do not successfully rebut the business judgment rule, which includes rebutting the presumption of good faith, summary judgment should be granted. *See McGowan v. Ferro,* 859 A.2d 1012, 1030-32 (Del. Ch.2004) (granting summary judgment to

defendant directors who approved an extension of a merger agreement where plaintiff did not "raise a genuine issue of material fact on the issue of bad faith"), *aff'd without pub'd opinion,* 873 A.2d 1099, 2005 WL 1123388 (Del.2005); *see also Gaylord Container,* 753 A.2d at 487 (granting summary judgment in favor of defendant directors where "plaintiffs ... failed to produce evidence creating a genuine issue of material fact regarding whether the board's actions [were] entitled to the protection of the business judgment rule[ ]"). With these principles firmly in mind the court will next examine each of the acts supposedly constituting breaches of the duty of loyalty.

### 2. *"Funding Cutoff"*

One way in which the GTCR VI Entities allegedly breached the duty of loyalty is by "deciding to cease further purchases of LeapSource preferred stock." *See* Mot. (doc. 347) at 17. The Entities maintain that in making that decision they were simply exercising their contractual rights under the September 27, 1999, Purchase Agreement with LeapSource. More specifically, the Entities point to that part of the Agreement identifying three conditions to their stock purchase obligations thereunder:

> [GTCR's] obligation to purchase any stock of ... [LeapSource] ... will be conditioned on [LeapSource's] [1] not being in default under any of its material agreements, [2] adequate debt financing being available to fund any proposed acquisition or other Approved Use on terms satisfactory to ... [GTCR], *and* [3] ... [LeapSource's] operations and the acquisition or other use of proceeds being satisfactory to [GTCR].

Doc. 345, Vol. 2, exh. 21 thereto at EX0833-002 (brackets, numbers and emphasis added). By its terms, the third

condition in particular gave the GTCR VI Entities considerable leeway in deciding whether or not to purchase LeapSource stock. The Entities did not have to continue funding LeapSource through stock purchases unless LeapSource's "operations" were "satisfactory" to them. Adding to the GTCR VI Entities' discretion in this respect is the fact that the Purchase Agreement does not define either "operations" or "satisfactory." Obviously both terms are fairly expansive.

In *Mann I* this court held that that language was "not ambiguous[ ]" because there was "no doubt whatsoever that the agreement provides for a *conditional* obligation on the part of the GTCR entities to finance" LeapSource. *Mann I* (doc. 72) at 8 and 6. If any one of those conditions was not satisfied, the Entities did not have an obligation to provide additional funding to LeapSource. Furthermore, this court in *Mann I* explicitly "note[d] that the Purchase Agreement governs the duty of *any* shareholder to purchase stock in Leap-Source." *Id.* at 52 (emphasis added). It is undisputed that GTCR was LeapSource shareholder in that it "owned approximately 70% of LeapSource's common stock and 100% of its preferred stock." DSOF (doc. 348) at 6, ¶ 30 (citations omitted); *see also* PSOAF (doc. 417, pt.2) at 12, ¶ 30.

In addition to that broad discretion as to funding, the Purchase Agreement gave the GTCR VI Entities a fair amount of latitude in terms of investigating and inspecting LeapSource operations. In particular, that Agreement required LeapSource to "permit any representatives designated" by the GTCR VI Entities to "visit and inspect any" LeapSource property. Doc. 345, vol. 2, exh. 21 thereto at EX0083–006 at ¶ 3B. The GTCR VI Entities also had

the express right under the Purchase Agreement to "examine the corporate and financial records" of LeapSource, and to "discuss the affairs, finances and accounts of [LeapSource] corporations with the directors, officers, key employees and independent accountants of ... [LeapSource] [.]" *Id.*

There is proof in the record that "GTCR's concerns regarding LeapSource's performance, including cash burn rate and its ability to generate revenue and control costs, escalated during the latter half of 2000." *See* DSOF(doc. 348) at 9, ¶ 57 (citing references). Plaintiffs do not dispute this fact, except "to the extent that it is implied that these concerns were discussed among LeapSource board members[.]" PSOAF (doc. 417, pt.2) at 34, § VI, ¶ 57. Whether these concerns were discussed among LeapSource board members is irrelevant and not material at this point given the unilateral and conditional nature of the GTCR VI Entities' funding obligations under the Purchase Agreement. Hence this claimed "factual dispute" does not factor into the court's analysis at this juncture. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (citation omitted) ("Factual disputes that are irrelevant or unnecessary will not be counted[ ]" in opposing a summary judgment motion.)

In any event, based upon the GTCR VI Entities' escalating concerns as to, among other things, LeapSource's financial condition, the Entities exercised their rights under the Purchase Agreement by designating defendant Yih and Sean Cunningham, two GTCR employees, "to investigate [those] concerns." DSOF (doc. 348) at 9, ¶ 58 (citations omitted).[14] Messrs. Yih

---

14. Plaintiffs counter that Yih and Cunningham were not sent "merely to 'investigate GTCR's concerns[.]' " PSOAF (doc. 417, pt. 2) at 35, ¶ 58. Importantly, they do not dispute

that that was at least one reason for Yih and Cunningham's visits to LeapSource in late 2000 and January 2001, however.

and Cunningham were on site at Leap-Source in December 2000 and January 2001. While there, they "interviewed management, [and] reviewed data[,]" including financial data. DSOF (doc. 348) at 9, ¶ 59 (citations omitted). Based partially upon that investigation, in a February 27, 2001 letter the GTCR Entities advised LeapSource of its decision to stop funding, explicitly indicating its "dissatis[faction]" with "[t]he continued level of expenses incurred by [LeapSource] which greatly exceed [LeapSource's] revenues, resulting in continuing negative cash flows." *Id.*

■■■ As the foregoing demonstrates, the GTCR VI Entities' concerns about LeapSource's strained financial condition, together with the considerable leeway they had under the Purchase Agreement in terms of their stock purchase obligations, provided more than adequate justification for their decision to discontinue funding LeapSource in February 2001.

Against this backdrop plaintiffs are attempting to rebut the business judgment rule presumption. Plaintiff's refer to a February 24, 2001, "confidential memorandum" from plaintiff Gilman to LeapSource board members, which evidently they believe shows that the GTCR VI Entities did not act in good faith in deciding to discontinue funding LeapSource. They also cite to seven paragraphs in their SOAF which purports to summarize this memorandum. This "proof" is defective in at least two ways. First, plaintiff's memorandum did not include a cite to the record so that the

Gilman memorandum, which is the sole factual basis for plaintiffs' opposition to this aspect of defendants' summary judgment motion, could be located in this vast record.[15]

The second and more significant weakness in plaintiffs' proof is the form in which it was submitted. The paragraphs to which plaintiffs cite in their SOAF do not "set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial." *See Horphag,* 475 F.3d at 1035 (internal quotation marks and citations omitted) (emphasis added). Instead, those paragraphs appear to be broad generalizations by plaintiffs' counsel as to the contents of the Gilman memorandum. To illustrate, as plaintiffs' counsel depicts it, the Gilman memorandum "itemize[s] numerous acts by GTCR and by principals of GTCR that were harmful to LeapSource and have been alleged as breaches of fiduciary duties in this action." PSOAF (doc. 417, pt. 2) at 73, ¶ 145 (citation omitted). Even assuming the admissibility of this memorandum, plaintiffs have not specifically directed the court to anywhere in this ten page, single-spaced document which shows a genuine issue of material fact as to whether the GTCR VI Entities lacked good faith when they decided to discontinue funding LeapSource. That memorandum is fairly detailed, covering a variety of topics. The court declines to speculate as to exactly what parts of that memorandum

---

**15.** This failure to cite to the record in this instance was compounded by the fact that in referring to the Gilman memorandum in their SOAF, plaintiffs seem to cite to exhibit 6 thereto. But plaintiffs' exhibit six is a document entitled " 'Lessons Learned' Summary," which on the face of it has nothing to do with GTCR's funding decision. The court then looked to defendants' exhibit six but it, too, is irrelevant to this funding decision. Evidently plaintiffs are referring to exhibit six filed as

part of their response in opposition to a 2005 motion for summary judgment as to aiding and abetting and tortious interference claims.

The court's file in this action consists of well over 400 docketed items. Although the court was under no obligation to do so, it did retrieve the Gilman memorandum which was filed in connection with a 2005 summary judgment motion. *See* Doc. 292, attachment 3 thereto.

are, from plaintiffs' perspective, relevant to the funding decision.

In short, the Gilman memorandum, the only evidence in this voluminous record upon which plaintiffs are relying, is insufficient to defeat this aspect of GTCR's summary judgment motion. The broad generalizations by plaintiffs' counsel fall well short of "designat[ing] *specific facts* showing that there is a genuine issue for trial[ ]" as to whether GTCR lacked good faith in deciding to cease purchase of LeapSource stock, which is plaintiff's burden in opposing this summary judgment motion. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (internal quotations omitted) (emphasis added). Thus, because plaintiffs have not identified any specific facts showing that there is a genuine issue for trial as to whether defendants "intentionally act[ed] with a purpose other than that of advancing the best interests of" LeapSource, or, for that matter, specific facts to support a finding of any other form of lack of good faith, defendants are entitled to summary judgment insofar as plaintiffs' breach of loyalty counts are predicated upon GTCR's decision to stop funding LeapSource.

■■■ A finding that defendants are entitled to summary judgment on this narrow breach of loyalty claim pertaining to the funding decision is bolstered by the fact that "absent a showing of culpability," Delaware law "does not . . . require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders." *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del.Ch.1986); *see also Next Level Communications, Inc. v. Motorola, Inc.*, 834 A.2d 828, 854 and n. 100 (Del.Ch.2003) (observing that it did not "appear [that

majority stockholder] ha[ ]d [any] further obligation, fiduciary or otherwise to continue to fund" corporation "in its current business configuration[ ]"). In a similar vein, in *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386 (Del.Ch. 1999), the court held that the refusal by the largest shareholder of a holding company to "waive its preemptive rights" and its refusal "to assume further financial obligations on behalf [of the corporation] without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties." *Id.* at 411. Controlling shareholders are under no obligation to provide further financing in part because they "are not required to act altruistically towards" minority shareholders. *Thorpe v. CERBCO*, 1993 WL 443406, at *7 (Del.Ch.1993). In short, as noted earlier, although the fiduciary duties of due care and loyalty encompass a variety of obligations, self-sacrifice is not among them. As an aside, the court observes that had the GTCR VI Entities continued to fund LeapSource under its then existing unstable financial condition, arguably that decision would have been tantamount to a lack of good faith in that it could have been viewed, colloquially speaking, as "throwing good money after bad."

### 3. "Interference with Management"

To define the contours of plaintiffs' claim that GTCR breached its duty of loyalty by interfering with management, GTCR looked to the plaintiff Kirk's answers to interrogatories.[16] Plaintiff Kirk verifies that the "GTCR . . . Entities interfered with [her] authority to act as CEO of LeapSource in December 2000 and continuing into 2001, when Dan Yih and other GTCR representatives began conducting

---

**16.** Interestingly, the interrogatory itself and hence the answer pertain *only* to count 17 which does *not* allege a breach of the duty of loyalty; and which the court has determined plaintiffs lack standing to pursue.

interviews and discussions with employees at all levels of the LeapSource organization, including secret negotiations with Mr. Makings, in a manner that severely disrupted management." Doc. 345, vol. 1, exh. 2 thereto at 10, ¶ C. According to Ms. Kirk, "[t]hese discussions undermined management, were damaging to [LeapSource], and distracted the corporate focus from client-based services to internal power and control." *Id.*

As to the GTCR principals, as distinguished from the GTCR VI Entities, plaintiff Kirk verifies that they "repeatedly interfered with and undermined LeapSource management[.]" *Id.* at 9. Citing to allegations in the complaint, plaintiff Kirk lists a number of ways in which the principals allegedly did that.[17] There is no need to recite that entire litany. Suffice it to say for now that, among other things, supposedly the GTCR principals "direct[ed] Ms. Kirk's time and efforts to sales[,]" while at the same time "redirecting [her] time and efforts to a second round of financing[.]" *Id.* Additionally, the principals "direct[ed]" her to "execute employee layoffs" and "reductions in compensation[.]" *Id.*

GTCR does not dispute that any of the alleged acts occurred. Instead, GTCR posits that it had broad statutory and contractual oversight and monitoring authority, and thus "each of the challenged acts [wa]s within the business judgment of the board and majority shareholders of LeapSource." Mot. (doc. 347) at 22. Plaintiffs discount GTCR's reliance upon its statutory and contractual oversight authority, reasoning that GTCR has not pointed to any "act or resolution of the board" authorizing the complained of conduct. Resp.

(doc. 417) at 18. Although unstated, evidently plaintiffs are contending that the absence of a board resolution or act constitutes lack of good faith sufficient to overcome the business judgment rule presumption.

■ Plaintiffs' argument is not persuasive either in terms of the GTCR VI Entities or the GTCR principals. The broad oversight and monitoring authority which the Purchase Agreement accorded the GTCR VI Entities significantly undermines their contention that those Entities lacked good faith with respect to the Yih investigation because there was no board resolution or act allowing that investigation. As previously noted, the Purchase Agreement required LeapSource to "permit *any* representatives designated by [the GTCR entities]" to (1) "visit and inspect" LeapSource "properties[;]" (2) "examine [LeapSource's] corporate and financial records[;]" and (3) "discuss the affairs, finances and accounts ... with [LeapSource's] directors, officers, key employees and independent accountants[.]" Doc. 345, vol. 2, exh. 21 thereto at EX0083–006, ¶ 3B. Thus, even without a board resolution or some other affirmative act by the board, the GTCR VI Entities had contractual rights to investigate LeapSource's operations, as they did in late 2000 and early 2001.

With the advantage of hindsight, plaintiffs may regret this provision. In addition, as defendants put it, the Yih investigation "may well have been disruptive to [plaintiff] Kirk's CEO authority[.]" Reply (doc. 449) at 15. The fact remains, however, that such investigations were "part of

---

**17.** The court observes that these conclusory statements, citing as they do to the FAC, are not sufficient to overcome a summary judgment motion. *Alvarado v. FedEx Corporation,* 2006 WL 644875, at *1 (N.D.Cal. March 13, 2006) (citing *Thornhill Publishing Co. v. Gen-* *eral Telephone & Electronics Corp.,* 594 F.2d 730, 738 (9th Cir.1979)) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issue of fact and defeat summary judgment.")

the bargain under the Purchase Agreement." *See id.* Thus, the court concludes that plaintiffs have not met their initial burden of rebutting the business judgment rule as to the claim that the GTCR VI Entities breached their duty of loyalty by conducting the Yih investigation.

Nor have plaintiffs rebutted the business judgment rule presumption insofar as the GTCR principals are concerned. Plaintiffs baldly assert in their response memorandum that "[t]he GTCR defendants were *not* 'authorized to take these acts' as directors, because in fact the board of directors did not authorize them and individual directors have no such authority on their own." Resp. (doc. 417) at 18. Plaintiffs do not cite to any "specific facts" in the record to support this assertion, however. Likewise, they have not provided any legal analysis to support their position.

It is well settled in this Circuit that "the arguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.'" *Barcamerica Intern. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir.2002) (quoting *Smith v. Mack Trucks*, 505 F.2d 1248, 1249 (9th Cir.1974)). Indeed, the Ninth Circuit in *Mack Trucks* explicitly recognized that "[l]egal memoranda ..., in the summary-judgment con-

text, are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." 505 F.2d at 1249 (citation omitted). What is more, plaintiffs have not come forth with any evidence to support a finding here that the GTCR principals "intentionally act[ed] with a purpose other than that of advancing the best interests of [LeapSource][,]" one way to establish a failure to act in good faith. *See Stone*, 911 A.2d at 369 (internal quotation marks, citation and footnoted omitted).[18]

### 4. *"Interference with the Company's Sale"*

Another way in which GTCR allegedly breached the duty of loyalty is by interfering with the sale of LeapSource. In the "summer [of] 2000 LeapSource began interviewing various underwriters to discuss potential financial alternatives for the company." PSOAF (doc. 417, pt. 2) at 40, ¶ 68. As part of that process, "[i]n August 2000, GTCR sent [plaintiff] Kirk a list of investment banking firms to consider." DSOF (doc. 348) at 11, ¶ 69 (citations omitted); and PSOAF (doc. 417, pt. 2) at 40, ¶ 69. "After presentations by a number of investment bankers, LeapSource selected a team from Salomon Smith Barney ('SSB') to explore three alternatives: an initial public offering, finding an investor willing to supply second-round financing, or find-

---

18. There is a fundamental flaw, which the court cannot overlook, in the manner in which plaintiffs have presented their claim that the GTCR principals did not act in good faith because allegedly they interfered with LeapSource management. The problem is that when plaintiff Kirk was asked about this theory of liability in interrogatories, rather than describe the supposedly offending conduct based upon her personal knowledge of events, Ms. Kirk specifically referred to allegations in the FAC. *See* Doc. 345, vol. 1, exh. 2 thereto at 9. In the summary judgment context, however, a nonmovant cannot defeat a Rule 56 motion by merely "replac[ing] con-

clusory allegations of the complaint ... with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 889, 110 S.Ct. 3177, 111 L.Ed.2d 695. Yet that is what plaintiffs are attempting to do herein. Rather than submitting an affidavit or a declaration from someone with personal knowledge of the alleged interference with LeapSource management, such as presumably Ms. Kirk, she has simply reiterated conclusory allegations in the FAC. Therefore, arguably there is no admissible proof in the record as presently constituted to support this particular aspect of plaintiffs' breach of loyalty claim.

ing a potential buyer for the company." DSOF (doc. 348) at 11, ¶ 70 (citations omitted); and PSOAF (doc. 417, pt. 2) at 40, ¶ 70. "SSB, [plaintiffs] Gilman and Kirk solicited numerous prospective investors or buyers between October 2000 and March 20001 in an effort to locate another source of private capital for LeapSource." DSOF (doc. 348) at 11, ¶ 72 (citations omitted); PSOAF (doc. 417, pt. 2) at 41, ¶ 72. For different reasons, in the end, none of these efforts were fruitful.

Rather than explaining, with cites to the record, how GTCR purportedly "disrupt[ed] efforts to sell" LeapSource, plaintiffs cite to five paragraphs in their 216 paragraph SOFA. *See* Resp. (doc. 417) at 19. They then state that that *"handful of paragraphs ... suggest[s]* GTCR's role in disrupting efforts to sell the company and to preserve its value for the benefit of the shareholders and LeapSource creditors[.]" *Id.* (emphasis added) This approach is problematic for two reasons. The first is that obviously a "suggestion" that GTCR interfered with the sale of LeapSource is not sufficient to rebut the business judgment rule. Similarly, a "suggestion" does not create a genuine issue of material fact so as to defeat a summary judgment motion.

██ More compellingly, however, a second problem is that despite what plaintiffs imply, a careful examination of the cited paragraphs does not suggest, much less show, that GTCR interfered with or impeded the sale of LeapSource. Plaintiffs rely upon three incidents which they claim show interference by GTCR. First,

they rely upon a transaction involving EDS. Plaintiffs note that on February 27, 2001, GTCR faxed a letter to plaintiff Kirk. *See* PSOAF(doc. 417, pt. 2) at 104, ¶ 251 (citing exh. 30). As previously discussed, in that letter GTCR advised LeapSource of its decision to stop funding.[19] Plaintiffs indicate that that letter was faxed to Ms. Kirk "while she was in meetings with EDS executives interested in buying LeapSource." *Id.*

Evidently the inference which plaintiffs believe should be drawn from the foregoing is that the "stop funding" letter[20] impacted EDS' decision not to buy LeapSource. This is *not* a reasonable inference, however. And on a motion for summary judgment only *reasonable* inferences may be drawn from specific facts in the record as designated by the parties. *See Horphag*, 475 F.3d at 1035 (citation omitted); *cf. Devereaux v. Abbey*, 263 F.3d 1070, 1081 n. 3 (9th Cir.2001) ("[T]enuous inferences, standing alone, do not constitute sufficient evidence to survive summary judgment."). It cannot reasonably be inferred that the February 27, 2001, letter impacted EDS' decision not to buy LeapSource because, as GTCR notes, plaintiffs have "not cite[d] any evidence that anyone from EDS saw or read the fax, ... let alone ... that the fax had any impact whatsoever on ay discussions with EDS". Reply (doc. 449) at 16 (citing PSOAF (doc. 417, pt.2) at 104, ¶¶ 251–253). Moreover, plaintiffs have not cited to any evidence that EDS was a potential buyer.

---

**19.** In their SOAF, plaintiffs assert that the February 27, 2001, letter "said that GTCR would not be funding the Cargill deal." PSOAF (doc. 417, pt. 2) at 104, ¶ 253 (citing exh. 30). Even assuming, as the court does, that was simply an inadvertent misrepresentation, such inaccuracies, including wrong cites to the record, are unnecessarily distracting, and obfuscate rather than clarify what might

be an otherwise valid point. Plaintiffs were not alone in this regard.

**20.** The record is ambiguous in terms of whether this letter was faxed to Ms. Kirk while she was at EDS. Plaintiffs contend that it was, but there is no indication on the face of the letter that that is so. GTCR does not dispute that it faxed that letter, but it is silent as to where the letter was faxed.

Plaintiffs' reliance upon a prospective transaction with Computer Horizons Corporation ("CHC"), to show interference by GTCR is, if possible, even more attenuated than the EDS evidence. As plaintiffs depict it, GTCR also interfered with the sale of LeapSource because CHC "pulled out of their potential deal with LeapSource immediately after LeapSource executed its first reduction in force at the direction of GTCR." PSOAF (doc. 417, pt. 2) at 104, ¶ 254. Even assuming that there is admissible proof to support this statement, plaintiffs have not pointed to any specific facts in the record showing that "a prospective purchaser would have come forth because CHC had become a LeapSource customer." *See* Reply (doc. 449) at 16. Therefore, it is difficult if not impossible to see how the fact that LeapSource *may* have lost a customer because of a LeapSource reduction-in-force, supposedly done at GTCR's behest, constitutes interference by GTCR with the sale of LeapSource.

Third, plaintiffs claim that GTCR interfered with the sale of LeapSource to Exult. To support this contention plaintiffs rely solely upon roughly a half page quote from the deposition of Mr. Campbell, Exult's Chief Operating Officer. Mr. Campbell testified that Exult "found [it] odd" that LeapSource was not "interested in continuing discussions" about selling LeapSource to Exult. Resp. (doc. 417) at 20 (citation omitted). When asked why he found "that odd[,]" Campbell candidly responded:

> Because, ... [Exult] thought [it] had some interest in [LeapSource] and we would have thought that they would have pursued those discussions. So again, pure—it was *pure speculation* on [Exult's] part, but what [Exult] w[as] wondering was why wouldn't they have considered [Exult's] alternative to closing down [LeapSource].

*Id.* (citing Deposition of Kevin Campbell at 37:11–38:3) (emphasis added); *see also* PSOAF (doc. 417, pt. 2) at 105–106, ¶ 255 (citation omitted) (same). Obviously "[p]ure speculation" as to why LeapSource "wouldn't ... have considered" being bought by Exult is not sufficient to meet plaintiffs' burden in terms of rebutting the business judgment rule, and hence averting summary judgment on this particular duty of loyalty claim.

Not only that, even according to plaintiffs, it is "[u]ndisputed that Exult's CEO ... did not believe that Exult would have consummated the contemplated transaction with LeapSource because Exult was not looking at taking on a company with a negative cash flow." PSOAF (doc. 417, pt.2) at 43, ¶ 76. Thus, plaintiffs all but concede that there is no merit to their allegations that GTCR interfered with the sale of LeapSource to Exult. Due to what Exult perceived to be LeapSource's precarious financial situation, the Exult transaction was not going to be consummated, regardless of any actions by GTCR.

As the foregoing discussion shows, standing alone or taken together, the evidence upon which plaintiffs are relying to support their theory that GTCR lacked good faith because it interfered with the sale of LeapSource is not sufficient to defeat the defendants' summary judgment motion as to this particular claim.

### 5. "Improper Disposition of Company Assets"

According to plaintiffs, the fourth way in which GTCR breached its duty of loyalty is by improperly disposing of assets during LeapSource's wind-down period. Plaintiffs are challenging the propriety of three separate transactions: (1) the sale of the ICG Division of LeapSource to ICG Group, Inc. ("the ICG asset sale"); (2) customer asset sales; and (3) the LeapSource em-

ployee severance/release agreements. The court will address each of these asset dispositions in turn.

#### a. ICG Asset Sale

Two earlier decisions in this action, provide fairly detailed accounts of the relationship between the "ICG business" and defendant Michael Makings, as well as LeapSource's sale of that business to Makings. *See Mann v. GTCR Golder Rauner, L.L.C.,* 351 B.R. 708, 709–710 (D.Ariz. 2006); and *Mann v. GTCR Golder Rauner, L.L.C.,* 351 B.R. 714, 717–718 (D.Ariz. 2006) The court assumes familiarity with these prior decisions. For purposes of the present motion, a few of those facts are worth highlighting:

> It is undisputed that, prior to his resignation, Makings began planning a reacquisition of the ICG–9 Asset and began negotiating with [LeapSource] for such reacquisition. In relation to this planning, Makings incorporated a new entity, ICG Group, for the purpose of reacquiring and operating the ICG business. Furthermore, it is undisputed that Makings formally resigned as the CEO and as a director of [LeapSource] on March 20, 2001. The Agreement, which was drafted by [LeapSource's] attorneys, was entered into between three and ten days later, on either March 23, 2001 (the date on the Agreement) or March 30, 2001 (the alleged date that the Agreement was signed), and the ICG Asset was transferred to Makings on March 30, 2001.

*Mann II,* 351 B.R. at 713 (citation omitted).

The terms of the ICG asset purchase agreement, as this court has previously found, were as follows, and also have some bearing on the present motion:

> [T]he 'purchase price' for the transfer consisted of ICG Group's forgiveness of the Note that [LeapSource] owed to

Makings, which he had assigned to ICG Group.... Additionally, ICG Group also agreed to assume several third party liabilities owned by LeapSource, including telephone lease payments, building lease payments, copier lease payments, various accounts payable, and past and future payroll expenses.

*Id.* at 710 (citations omitted).

To the extent plaintiffs are suggesting that there was a conflict arising from the ICG asset sale because Makings was a former LeapSource officer and board member, GTCR asserts that this conflict argument is without merit. First, of all, as this court has previously recognized, "Makings was no longer an officer of director of LeapSource." Mot. (doc. 347) at 27 (citations omitted). Second, as GTCR points out, Makings was not at the March 30, 2001, board meeting where the ICG asset sale was approved. *Id.* at 27–28 (citing Doc. 345, vol 3, exh. 73 thereto). GTCR hastens to add that LeapSource's Chief Restructuring Officer, David Eaton, recommended the ICG asset sale to the board; the board approved it; and "none of [the] board members had an interest in the transaction or stood to gain from its approval." *Id.* at 28. Lastly, GTCR adds that to the extent plaintiffs theorize that the GTCR defendants had an "improper motive" for the ICG asset sale in that they "approved [that sale] ... to avoid liability on a supposed guarantee of Makings' $2.5 million note[,]" this theory "collapses." It "collapses," GTCR asserts, "because it is ... uncontested that GTCR did not guarantee Makings' note." Mot. (doc. 347) (citing DSOF (doc. 348) at ¶ 32); *see also* PSOAF (doc. 417, pt. 2) at 13, ¶ 32.

On the face of it, these arguments carry substantial weight. The ICG asset sale cannot be viewed in isolation though. As reflected in the March 30, 2001 "Minutes of Special Meeting of" the LeapSource

Board of Directors, Mr. Eaton "recommended the proposal" for the sale of LeapSource's ICG Division to ICG Group, of which defendant Makings was president. Doc. 345, vol. 3, exh. 73 thereto at LS–91–0295. The directors who were present at that meeting were defendants Nolan and Yih, both GTCR principals, as well as LeapSource's counsel and Mr. Eaton. *See Id.*

After presenting the proposed terms of that purchase agreement, according to the board meeting minutes, Mr. Eaton "noted . . . that [LeapSource] [wa]s unable to effectively shop the ICG Division to other potential buyers." *Id.* at 2, LS–91–0296. Further, Mr. Eaton "noted" that if LeapSource "decided not to accept the" ICG Group proposal, it "would be forced to shut down the ICG Division and terminate 20 or more employees." *Id.* "[S]hut[ting] down [LeapSource] would also result in a breach of the release related to the ICG Division and severance issues with its employees[,]" Mr. Eaton reported. *Id.*

Plaintiffs describe Eaton's reasons for recommending the ICG asset sale as "self-serving characterization[s][.]" Resp. (doc. 417) at 21. From plaintiffs' standpoint, Eaton's reasons for recommending the sale are nothing more than "retroactive justifications for a transaction that was made because GTCR wanted it done, to hasten the disposition of the pieces of LeapSource and to put the company into bankruptcy[.]" *Id.* at 21–22. Plaintiffs then direct the court to a document which reads in its entirety:

- 1st cut—ICG 2001
- Free Cash Flow Excludes Changes in Working Capital
- At <u>Value</u>

| | |
|---|---|
| 5x Free Cash | 3,987K |
| 6x Free Cash | 4,785K |
| 7x '' | 5,582K |
| 8x '' | 6,380K |

Resp. (doc. 417) at 22 (citing PSOAF (doc. 417, pt.2) at ¶ 219). Plaintiffs maintain

that this document represents "GTCR's own preliminary evaluation show[ing] that they still believed the business was worth approximately $4–6.4 million in early 2001[.]" PSOAF (doc. 417, pt. 2) at 94, ¶ 219.

 Aside from authentication problems, it is not readily apparent from the face of this document the significance of these words and figures, except that it apparently relates to the value of the ICG asset. A reasonable inference can be drawn from this document, however, that sometime near the ICG asset sale, that asset had a value greater than the "sale price" to ICG Group. From that and all of the circumstances surrounding that sale, there is evidence, albeit scant, which at least at this juncture creates a genuine issue of material fact. Consequently, the court denies GTCR's summary judgment motion insofar as it is based upon a breach of the duty of loyalty arising out of the ICG asset sale. However, the denial of this motion is without prejudice to renew by appropriate motion.

### b. Customer Asset Sales

As part of winding down its operations, in a March 19, 2001, letter, the GTCR VI Entities advised LeapSource that it would provide additional funding, "up to $750,000 purely to allow LeapSource to provide for an orderly transition of the outsourced accounting operations back to their clients with minimal disruption as possible." Doc. 345, vol. 3, exh. 66. To that end, approximately six weeks later, LeapSource entered into "Settlement and Asset Purchase Agreements" with two of its clients, COMSYS Information Technology Services, Inc. and Heritage Golf Group, Inc. *Id.*, vol. 3, exh. 72 thereto at LS–91–0120 and LS–91–0098. LeapSource entered into a similar agreement with another one of its clients, Xpedior Incorporated. *Id.* at LS–91–0098.

In addition to transitioning back the accounting operations which had previously been outsourced to LeapSource, under these agreements the former clients purchased hard assets such as office furniture, fixtures and equipment. *See id.*, exh. 72 thereto. "The LeapSource board was not asked to approve any of these transactions." DSOF (doc. 348) at 14, ¶ 92; PSOAF (doc. 417, pt. 2) at 50–51, ¶ 92.

In their answers to interrogatories, plaintiffs indicate that the COMSYS transaction was "disadvantageous ... to LeapSource[,]" and that the sale of the hard assets to Xpedior and Heritage Golf was "for a price that was not fair and reasonable." Doc. 345, vol. 1, exh. 1 thereto at 13. In responding to this aspect of GTCR's motion, plaintiffs focus *exclusively* on the sale to COMSYS (a GTCR portfolio company), of what they term "LeapSource's intellectual property[.]" Resp. (doc. 417) at 22. With absolutely no cites to the record, and no analysis of waste, which has a specific meaning in this context, plaintiffs suggest that "intellectual property, including the CxO Desktop interface, was wasted." *Id.* at 23 (footnote omitted).

By responding in this way, it appears to the court that plaintiffs have abandoned their position that any aspect of the transition back agreements amounted to a breach of the duty of loyalty. The court will not speculate as to what "intellectual property" plaintiffs are referring, let alone what the value of that property was and how that value should be measured. At a minimum, the court finds that plaintiffs have not met their initial burden of rebutting the business judgment rule in connection with these customer asset sales. Thus, the court finds that defendants are entitled to summary judgment as to this aspect of plaintiffs' breach of loyalty claims as well.

c. *Employee Severance/Release Agreements*

On March 2, 2001, in a cost-cutting effort, LeapSource "terminated virtually all the headquarters staff[,]" which included the individual plaintiffs. *See* DSOF(doc. 348) at 15, ¶ 99 (citations omitted); PSOAF (doc. 417, pt.2) at 55, ¶ 99. "In March 2001, Rhodes [LeapSource's then Vice President of Finance and Accounting] and Eaton [LeapSource's Chief Restructuring Officer] attempted to negotiate reductions in severance obligations for terminated employees." *Id.* at 15, ¶ 100 (citations omitted); and PSOAF (doc. 417, pt.2) at 55, ¶ 100. In keeping with its cost-cutting goal, LeapSource offered to pay its employees "33% of [their] total severance payments, in a lump sum, rather than the full amount over an extended period of time[.]" Doc. 345, vol. 3, exh. 62 thereto.

In offering that severance payment, LeapSource advised its employees: "Regardless of your acceptance or declination of this offer, as set forth in your *employment agreement* and enclosed amendment, you are required to sign the enclosed release in order to obtain any form of severance payment." *Id.* (emphasis added). The referenced "Waiver and Release of Claims" was fairly broad, although it did exclude severance payments and "vested stock rights previously granted by [LeapSource][.]" *Id.* at CKDQ–0288. It is undisputed that "[n]one of the individual plaintiffs reached agreement with LeapSource on their severance." DSOF (doc. 348) at 15, ¶ 101 (citation omitted); PSOAF (doc. 417, pt.2) at 55–56, ¶ 101.

Plaintiffs dispute that those Agreements required "the release that GTCR demanded." *See* Resp. (doc. 417) at 23. The court has carefully reviewed the Senior Management Agreements and Employment Agreements which GTCR indicates

"all" contain an "explicit 'condition precedent'" in the form of requiring a release from employees in connection with receiving lump sum severance payments. See Mot. (doc. 347) at 31 (citing Doc. 345, vol. 2, exhs. 20, 25–30 thereto.) The court's review revealed that while the Employment Agreements did include a release as an explicit "condition precedent" to GTCR's obligation to provide "any severance payments pursuant to th[at] Agreement," the Senior Management Agreements did not. *Compare* Doc. 345, vol. 2, exhs. 27–30 thereto at ¶ 6(e)(iv); *with* Doc. 345, vol. 2, exhs. 20, 25–26.

■ Regardless, the court is fully aware that from plaintiff's standpoint LeapSource's request for a release as a *quid pro quo* to receiving severance pay meant "that money otherwise available for the payment of former employee's wage or severance claim on an equitable basis went only to those former employee who would agree to release GTCR from any potential claim of liability." Resp. (doc. 417) at 23 (footnote omitted). Without more, the court is at a loss to see how that result rebuts the business judgment rule presumption here. Even without an express contractual right to do so, which evidently GTCR did not have with respect to some of the plaintiffs, requesting a release under these circumstances is nothing more than the exercise of business judgment. Put somewhat differently, the decision to require a release as a condition to making lump sum severance payments, when a business is in a compromised financial condition, is not "so far beyond the bounds of reasonable business judgment that it seems essentially inexplicable on any ground other than bad faith." *See Parnes,* 722 A.2d at 1246. Therefore, because plaintiffs have not met their burden of rebutting the business judgment rule as to the employee releases, defendants are entitled to summary judgment insofar as the breach of loyalty counts are premised upon defendants requiring those releases.

To summarize with respect to plaintiffs' breach of loyalty counts, with the exception of the ICG asset sale, summary judgment is proper. As should be abundantly clear by now, for the most part plaintiffs have failed to meet their burden of "establish[ing] facts necessary to negate any element of the business judgment rule, and thus defendants are 'entitled to summary judgment as a matter of law'" as to those counts alleging a breach of the duty of loyalty, except to the extent the ICG asset sale forms the basis for this alleged breach. *See Roselink,* 386 F.Supp.2d at 224 (quoting Fed.R.Civ.P. 56).

### D. Duty of Due Care

At the outset it is necessary to clarify the scope of plaintiffs' duty of care claim. In the September 30, 2003 dismissal order, among other things, this court dismissed such claims to the extent that plaintiffs were seeking recovery against GTCR directors and officers. *See Mann I* (doc. 72) at 49–50. Thus, the only remaining substantive duty of care claim is the Trustee's claim against the GTCR VI Entities, "[a]s majority shareholders of LeapSource[.]" FAC (doc. 121) at 75, ¶¶ 325 and 326.

The Entities advance three separate arguments as to why summary judgment is appropriate as to the breach of the duty of care alleged in count two of the FAC. First, relying upon *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.,* 137 F.Supp.2d 502 (S.D.N.Y.2001), they contend that in the absence of a breach of the duty of loyalty, "Delaware law does not recognize a duty of care claim against a controlling shareholder[.]" Mot. (doc. 347) at 12. And, because, according to the GTCR VI Entities the "plaintiffs cannot establish any breach of the duty of loyalty," their duty of

care claim necessarily fails as a matter of law. *Id.* The denial of GTCR's summary judgment motion as to one aspect of the alleged breach of the duty of loyalty, *i.e.* the ICG asset sale, forecloses this argument however.

Second, again relying upon *Color Tile,* the GTCR VI Entities argue that this duty of care claim is "an impermissible effort to circumvent the exculpatory provision in LeapSource's certificate of incorporation." Mot. (doc. 347) at 12. In particular, they argue that "[p]laintiffs cannot avoid" that provision "simply by asserting the same alleged misconduct against the shareholders who designated those directors." *Id.* To support this argument, the GTCR VI Entities rely upon the *Color Tile* court's reasoning that:

> Enabling plaintiff to sue the shareholder defendants for acts of [their director and officer] for which [the director and officer] personally cannot be held liable would provide an illogical end-run around the protections of § 102(b)(7).

*Id.* (quoting *Color Tile,* 137 F.Supp.2d at 515).

The court does not read *Color Tile* as broadly as the GTCR VI Entities urge. As this court interprets *Color Tile,* it is limited to a situation where there are no allegations that the shareholder defendants "individually took any specific actions to breach a duty of care[.]" *See Color Tile,* 137 F.Supp.2d at 515. Rather, the plaintiff's theory in *Color Tile* was "that the shareholder defendants [we]re vicariously liable for breach of their duty of care by [their director and officer] as their agent." *Id.* The court is not persuaded by the GTCR VI Entities' attempt to downplay the significance of this agency theory. Indeed it was the "agency theory" which the court expressly found led to "an anomalous result" in that case. *See id.*

In contrast, as plaintiffs are quick to point out, they are suing the GTCR VI Entities for their "own misconduct[.]" *See* Resp. (doc. 417) at 11. The plaintiffs herein are not suing the GTCR VI Entities on a theory of vicarious liability. Thus, the court finds that *Color Tile* does not govern the duty of care claim which plaintiffs allege against the GTCR VI Entities.

■■■ The GTCR VI Entities' third argument is that summary judgment is warranted on the duty of care claim because plaintiffs have not met the high standard of showing gross negligence. "To establish a breach of the duty of due care, a plaintiff must ordinarily establish gross negligence on the part of the directors." *Growe,* 2004 WL 2677216, at *7 (citing, *inter alia, Emerald Partners,* 787 A.2d at 90). "This standard appears to be synonymous with engaging in an irrational decisionmaking process." *Greater Southeast Community Hosp.,* 353 B.R. at 339 (internal quotation marks and citation omitted). "It signifies more than ordinary inadvertence or inattention[,] ... but is nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Id.* (internal quotation marks and citations omitted). Thus, "[i]t has been said that 'Delaware courts tolerate ordinary negligence from corporate fiduciaries.'" *Growe,* 2004 WL 2677216 at *7 (quoting *In re United Artists Theatre Co. v. Walton,* 315 F.3d 217, 231 (3d Cir.2003)).

■■■ It is important to clarify the scope of due care owed under Delaware law. "In Delaware, the merits of a business decision are considered separately from the process used to reach that decision." *Greater Southeast Community Hosp.,* 353 B.R. at 339 (internal quotation marks and citation omitted). "Due care in the decisionmaking context is *process* due care only." *Id.* (internal quotation marks and citation omitted) (emphasis in original). "The [threshold] question is whether

the process employed [in making the decision] was either rational or employed in a *good faith* effort to advance corporate interests." *Id.* (internal quotation marks and citations omitted) (emphasis in original).

The difficulty in the present case is twofold. The GTCR VI Entities believe that the only decision at issue with respect to the duty of care claim is the decision to stop funding LeapSource. *See* Mot. (doc. 347) at 13; and Reply (doc. 449) at 12. It is not entirely clear, however, that plaintiffs' duty of care claim is so limited. *See* Resp. (doc. 417) at 13–14. Second, because of their narrow focus, defendants have not met their initial burden as the moving party "the absence of any genuine issue of material fact[ ]" as to the duty of care claim. *See Horphag Research,* 475 F.3d at 1035 (citation omitted). Accordingly, the court denies this aspect of the GTCR Entities' motion without prejudice to renew by appropriate motion.

### E. Aiding and Abetting Breaches of Fiduciary Duty

■ Three of the remaining counts (4, 6 and 7) allege the aiding and abetting of breaches of fiduciary duty against various defendants. "A claim for aiding and abetting a breach of fiduciary duty requires ... (1) the existence of a fiduciary relationship; (2) a *breach* of that *duty;* (3) knowing participation by *the non-fiduciary;* and (4) damages." *In re American Business Financial Services, Inc.,* 2007 WL 510094, at *6 (Bankr.D.Del. Feb.13, 2007) (citation omitted) (emphasis added). For the reasons set forth below, summary judgment is proper as to each of these aiding and abetting counts because plaintiffs have not met their burden of proof.

Count four alleges that GTCR alone aided and abetted breaches of fiduciary duties "by majority shareholders and by professional advisers and consultants[.]" FAC (doc. 121) at 77. In an August 28, 2006, order, *inter alia,* this court granted summary judgment in favor of defendant Kirkland & Ellis, alleging breach of fiduciary duties by "professional advisers and consultants[.]" *See Mann,* 351 B.R. at 707. Further, Eaton and AEG entered into a stipulation of dismissal with prejudice as to all claims against them, including count three. *See id.* In light of the foregoing, GTCR is entitled to summary judgment as to this count insofar as it is based upon claimed breaches of fiduciary duties by "professional advisers and consultants."

Summary judgment in GTCR's favor on this count is also proper to the extent it is based upon breaches of fiduciary duties by "majority shareholders." That is so because, as set forth above, aiding and abetting a breach of fiduciary duty requires a showing of, among other things, "knowing participation in the breach by the *non-fiduciary defendant* [.]" *See Wallace v. Wood,* 752 A.2d 1175, 1184 (Del.Ch.1999) (emphasis added). GTCR is not, however, a "non-fiduciary defendant." Indeed, the crux of plaintiffs' theory of liability against GTCR, as with the other defendants, is that it owed fiduciary duties to plaintiffs.

■ Plaintiffs readily concede "that a person who himself owes a fiduciary duty with respect to a transaction or course of conduct cannot be liable for aiding and abetting a breach of that same fiduciary duty by another because the same facts that would otherwise constitute aiding and abetting would constitute a 'primary breach of fiduciary duty." Resp. (doc. 417) at 24. The flaw with this argument, as plaintiffs view it, is that not "every one of the defendants ... *admit[s]* that they were fiduciaries and were *at all times* acting in a role that imposed upon them fiduciary duties toward the plaintiffs[.]" *Id.* (emphasis in original). Plaintiffs have not cited to any specific facts in the record

showing that GTCR was a "non-fiduciary" with respect to any given alleged breach of fiduciary duty, however. Similarly, plaintiffs have not designated any specific facts creating a genuine issue of material fact as to GTCR's asserted "non-fiduciary" status. Thus, the court also grants GTCR's summary judgment motion as to count four which alleges aiding and abetting breaches of fiduciary duties by majority shareholders.

For the reasons just discussed, summary judgment in favor of defendants GTCR and the GTCR VI Entities is appropriate with respect to count six, which alleges aiding and abetting breaches of fiduciary duties by "directors and officers[.]" FAC (doc. 121) at 79. Again, plaintiffs have not come forth with any evidence that these defendants were acting in anything other than a fiduciary capacity.

Finally, count seven alleges "aiding and abetting breach of fiduciary duties by professional advisers and consultants": against the GTCR Entities and four GTCR principals.[21] FAC (doc. 121) at 81. As discussed above, count seven, which is predicated upon count three, necessarily fails as a matter of law because without the underlying breach of fiduciary duty, there can be no claim for aiding and abetting that purported breach. *See McGowan*, 859 A.2d at 1041 (granting summary judgment as to aiding and abetting breach of fiduciary duty count after granting summary judgment as to the underlying breach of duty of loyalty count). Consequently, the court grants defendants' motion for summary judgment as to aiding and abetting as alleged in count seven.

## III. Other Remaining Counts

### A. Misappropriation of Trade Secret

Because plaintiffs are not opposing GTCR's motion with respect to count 13, misappropriation of trade secrets, the court grants this aspect of GTCR's summary judgment motion. *See* Resp. (doc. 417) at 23, n. 6.

### B. Aiding and Abetting Fraudulent Transfer

In count 8 of the FAC, the plaintiff trustee alleges that GTCR, Nolan, Rauner, Yih and the GTCR Entities aided and abetted a fraudulent transfer, that is the ICG asset sale. Plaintiffs further allege that that sale was a fraudulent transfer "in violation of applicable state law[.]"[22] FAC (doc. 121) at 82, ¶¶ 366 and 367; at 83, ¶ 368.

The GTCR defendants are moving for summary judgment as to this count on several grounds. Their primary argument is that "[n]o Arizona court has recognized a cause of action for 'aiding and abetting a fraudulent conveyance,' and this Court should not be the first." Mot. (doc. 347) at 36. If the court is inclined to recognize the existence of such a cause of action, the GTCR defendants believe that they still would be entitled to summary judgment because plaintiffs lack evidence of any of the three elements necessary to prove aiding and abetting under Arizona law: (1) an underlying tort; (2) knowledge of tortiousness; and (3) substantial assistance/encouragement.

 Plaintiffs do not deny defendants' primary contention: There is no cause of

---

21. Mr. Makings also is named as a defendant in this count, but as previously mentioned, he has separately moved for summary judgment.

22. Under Arizona's Uniform Fraudulent Transfer Act ("AUFTA"), a transfer "is fraudulent as to a creditor whose claim arose before the transfer" if, as a result of the transfer, the debtor becomes insolvent and the transfer was not made in exchange for "reasonably equivalent value." A.R.S. § 44–1005 (2003).

action under Arizona law for aiding and abetting a fraudulent conveyance. Instead, they urge this court to recognize such a cause of action against these non-transferee defendants[23] based upon section 876(b) of Restatement (Second) of Torts. Under that section, "a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person." *Wells Fargo Bank v. Arizona Laborers, Teamsters*, 201 Ariz. 474, 485, 38 P.3d 12, 23 (2002) (citations omitted).

Additionally, plaintiffs rely upon *Banco Popular North America v. Gandi*, 184 N.J. 161, 876 A.2d 253 (2005), wherein the Court held that plaintiff stated a cause of action for conspiracy to violate New Jersey's UFTA. There, an attorney supposedly advised his client to transfer all of the client's assets into his wife's name to avoid having those assets attached by the creditor bank. Plaintiffs argue for an expansion of *Gandi*, reasoning that "if there is liability for *conspiring* to assist a fraudulent transfer, there may also be liability for *aiding and abetting* a fraudulent transfer." *See* Resp. (doc. 417) at 28. This liability attaches, from plaintiffs' standpoint, because the UFTA expressly "provides that it is *not abrogating* other well-established common law causes of action or bases of liability—such as liability for conspiracy and aiding and abetting." *Id.* Then, turning to the merits, plaintiffs strenuously contend that they have "more than sufficient evidence of the value of the ICG Assets" to support a fraudulent transfer, and hence a claim for aiding and abetting such a transfer. *Id.* at 29.

▬▬▬ Where, as here, a federal court is interpreting state substantive law, such as the UFTA, it "is bound by decisions of the state's highest court." *Vestar Development II v. General Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir.2001) (internal quotation marks and citation omitted). However, "[i]n the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, *decisions from other jurisdictions*, statutes, treaties, and restatements as guidance." *Id.* (internal quotation marks and citation omitted) (emphasis added). Arizona, like numerous other jurisdictions,[24] has adopted the UFTA. *See* A.R.S. §§ 44-1001–44-1010 (2003). But unlike other jurisdictions, Arizona courts have not yet spoken to the issue of whether a cause of action is cognizable against a non-transferee for aiding and abetting a fraudulent transfer. Therefore, this court will look to the law of other jurisdictions which have adopted the UFTA in a form substantially similar to that of Arizona's.

When it does that, the court is convinced that Arizona's Supreme Court would adopt the majority view; there is no independent cause of action for aiding and abetting a fraudulent transfer under the AUFTA. Plaintiffs did not cite to any particular section of AUFTA in arguing for aiding and abetting liability thereunder. Based upon their assertion that the AUFTA did not abrogate any common law causes of action, it can easily be inferred that plaintiffs are relying upon that Act's "catch-all" provision. That provision governs "[r]emedies of creditors[,]" and permits courts to award "[a]ny other relief the circumstances may required." A.R.S. § 44-1007(A)(4)(c) (2003). Faced with the argu-

---

**23.** Defendant Makings, the transferee, is also named in this count, but as mentioned at the outset, he has separately moved for summary judgment. Therefore, the issue here is framed strictly in terms of the non-transferee defendants.

**24.** "In 1996, Delaware became one of forty-two jurisdictions to adopt the [UFTA][.]" *Drenis v. Haligiannis*, 452 F.Supp.2d 418, 426 (S.D.N.Y.2006).

ment that this catch-all provision permits a claim for aiding and abetting under the UFTA, however, courts have uniformly rejected it as a matter of statutory construction. *See, e.g., Magten Asset Management Corporation v. Paul Hastings Janofsky & Walker LLP,* 2007 WL 129003, at *3 (D.Del. Jan.12, 2007) (surveying several cases court followed the "majority approach," finding that "liability cannot be imposed [based on an alleged fraudulent transfer under the UFTA] on non-transferees under aiding and abetting or conspiracy theories[ ]"); and *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 203 and n. 97 (citing cases) (Del. Ch.2006) ("Despite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action of 'aiding and abetting.' ")

When scrutinizing the plain language of the UFTA, courts agree that it is unambiguous in that it does not "suggest[ ] an intent to create an independent tort for damages [for aider-abettor liability]." *Freeman v. First Union National Bank,* 865 So.2d 1272, 1277, 29 Fla. L. Weekly S36 (Fla.2004). The *Freeman* court provided the following rationale for finding no ambiguity in Florida's UFTA ("FUFTA"):

> On the face of the statute, there is no ambiguity with respect to whether FUFTA creates an independent cause of action for aiding-abetting liability. There simply is no language in FUFTA that suggests the creation of a distinct cause of action for aiding-abetting claims against non-transferees. Rather, it appears that FUFTA was intended to codify an existing but imprecise system whereby transfers that were intended to defraud creditors could be set aside.

*Id.* at 1276.

Stated somewhat differently:

> At most, [the][ ]UFTA's 'catch-all' provision gives a court flexibility to fashion remedies not explicitly provided for in the statute. The provision does not permit the court to assign liability where the Act did not, or to create out of whole cloth 'substantive rights of action with accompanying damages which are not otherwise implied or stated in the statute.

*Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,* 2004 WL 771230, at *14 (S.D.Ind. March 24, 2004) (quoting *FDIC v. White,* 1998 WL 120298, *2 (N.D.Tex. March 5, 1998)).

This court sees no reason to deviate from this well-reasoned line of cases, and plaintiffs certainly have not provided any. Neither the Restatement (Second) Torts nor the New Jersey Supreme Court's *Gandi* decision provide an adequate basis for recognizing a cause of action for aiding and abetting a fraudulent transfer under the AUFTA. Plaintiffs' argument that section 876(b) of the Restatement provides a basis for imposing such liability misses the mark. Liability under that section is limited to those who aid and abet "tortfeasors." It does not apply to those who aid and abet statutory violations such as the AUFTA.

Plaintiffs' reliance upon *Gandi* is equally unavailing. Obviously the issue before the *Gandi* court was whether to recognize a cause of action for *conspiring* to facilitate a transfer in violation of New Jersey's UFTA, not *aiding and abetting* a UFTA violation. It is axiomatic that conspiracy and aiding and abetting are two separate and distinct causes of action. For all of these reasons, the court finds that summary judgment should be granted in defendants' favor as to count 8, alleging aiding and abetting fraudulent transfers.

## C. Trust Fund Doctrine

 In count nine of the FAC plaintiffs invoke the trust fund doctrine, which "was judicially created to ensure that all creditors' claims are first equitably satisfied before stockholders may claim their rights upon the assets of an insolvent corporation." *A.R. Teeters & Associates, Inc. v. Eastman Kodak Company*, 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (1992) (citations omitted). The trust fund doctrines provides that "[i]ndependently of statute, if corporate officers divide the assets among stockholders when the corporation is insolvent or where the corporation is thereby rendered insolvent, such officers are personally liable for corporate debts, or at least to the extent of the amount of assets received by them." *Realty Exchange Corporation v. Cadillac Land and Development Company*, 13 Ariz. App. 232, 234, 475 P.2d 522, 524 (1970) (internal quotation marks and citation omitted); *see also Southern Arizona Bank and Trust Co. v. U.S.*, 181 Ct.Cl. 426, 386 F.2d 1002, 1005 (1967) (citation omitted) (emphasis added) ("Arizona follows the . . . rule that where *stockholders* of a corporation *receive* its *assets* on liquidation and leave it without sufficient property to pay its creditors, then those *stockholders* are *required to respond* to creditors up to the full value of the assets received.") The theory underlying the trust fund doctrine "is that all of the assets of a corporation, immediately on its becoming insolvent, exist for the benefit of all of its creditors and that thereafter no liens nor rights can be created either voluntarily by operation of law whereby one creditor is given an advantage over others." *Teeters*, 836 P.2d at 1041 (internal quotation marks and citations omitted).

 After setting forth the elements necessary for a plaintiff to successfully invoke the trust fund doctrine,[25] the *Teeters* court unequivocally stated, "[l]iablity, if established, is limited to the value of the assets received by the director, officer or stockholder." *Id.* (citations omitted). Based upon that unequivocal language, defendants contend that to prevail on their trust fund doctrine claim, plaintiffs must show that the asset was transferred to a " 'director, officer or stockholder.' " *See* Reply (doc. 449) at 25 (quoting *Teeters*, 836 P.2d at 1041). Because the transfer at issue here, the ICG asset sale, was to defendant Makings, who was not a director, officer or shareholder at the time of that transfer, defendants assert that they are entitled to summary judgment with respect to the trust fund doctrine count(9).

 Citing to case law outside this jurisdiction, apparently it is plaintiff's position that they can invoke the trust fund doctrine even where the challenged transaction is *not* to a director, officer or stockholder. The court will ignore the fact that the cases to which plaintiffs cite do not apply Arizona law. Even when it does that, however, a careful reading of those cases shows that as in Arizona, the courts invoked the trust fund doctrine only when a director, officer or shareholder received a corporate asset during the insolvency of their corporation. *See In re Jacks*, 266 B.R. 728 (9th Cir. BAP 2001) (California trust fund doctrine applies to self-dealing corporate president, chief financial officer, director and shareholder of insolvent corporation); *In re Kallmeyer*, 242 B.R. 492 (9th Cir. BAP 1999) (Oregon trust fund doctrine applied to sole director, officer and shareholder of corporation where she

---

**25.** "To prevail on its trust fund doctrine claim, Kodak first must prove that (1) corporate assets were transferred to Teeters, (2) the transfer of corporate assets occurred while the corporation was insolvent, and (3) the transfer preferred Teeters to the disadvantage of other creditors of the same priority." *Teeters*, 172 Ariz. at 331, 836 P.2d 1034.

caused payments to be made to her or taxing authority while corporation was insolvent); and *In re Linderman,* 20 B.R. 826 (Bankr.W.D.Wash.1982) (Washington trust fund doctrine invoked to establish voidable preference under bankruptcy law where sole stockholders retained proceeds from the sale of insolvent corporation's real property). Therefore, plaintiffs' reliance upon the foregoing cases is misplaced for two reasons. First of all, those cases are not applying Arizona law. Second, they are factually distinguishable from the present case where the transferee, defendant Makings, was not a director, officer or shareholder of LeapSource at the time of transfer. Accordingly, the court finds that defendants are entitled to summary judgment with respect to count nine of the FAC. Bolstering this conclusion is the fact that as the party opposing summary judgment on this count, plaintiffs have failed to establish a *prima facie* trust fund doctrine claim in that they have not pointed to any specific facts in the record to support such a claim. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, . . ., against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

### D. Count 21—"Tortious Interference with Contract"

Count 21 of the FAC generally alleges that defendants GTCR, Rauner, Nolan and Yih intentionally interfered with the individual plaintiffs' "Senior Management Agreements" and "Employment Agreements" (the "employment contracts") with LeapSource. It appears from plaintiff Kirk's answers to interrogatories that this claimed interference resulted in plaintiffs "not receiving severance pay[ ] or other compensation[ ]" to which they believe they are entitled under those contracts. *See* Doc. 345, vol. 1, exh. 2 thereto at 22.

In *Mann I,* this court enumerated the elements of tortious intentional interference with contractual relations under Arizona law:

(1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Mann I,* (doc. 72) at 32 (quoting *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985)) (citing in turn *Antwerp Diamond Exchange v. Better Business Bureau of Maricopa County,* 130 Ariz. 523, 530, 637 P.2d 733 (1981)). "In addition to proving the four elements stated in *Antwerp Diamond Exchange,* the plaintiff bringing a tortious interference action must show that the defendant acted improperly." *Wagenseller,* 710 P.2d at 1043. The GTCR defendants devote this part of their summary judgment motion to this last element, improper conduct. Engaging in a fairly in-depth analysis, defendants urge this court to find that the alleged acts of interference were not improper as a matter of law primarily because "GTCR had a contractual right to cease funding if it was not satisfied[;]" and GTCR simply exercised that contractual right. *See* Mot. (doc. 347) at 44.

In a conclusory manner, plaintiffs respond that "GTCR's breaches of fiduciary duty constitute sufficient evidence that GTCR acted improperly toward the plaintiffs[.]" Resp. (doc. 417) at 34. This assertion, which plaintiffs did not support either factually or legally, is insufficient to defeat this summary judgment motion.

Thus, the court grants summary judgment in favor of the GTCR defendants as to count 21 as well.

### E. Count 22—"Breach of Purchase Agreement"

When the GTCR defendants filed this summary judgment motion, they did not have the advantage of this court's March 29, 2006, decision wherein the court, *inter alia*, granted summary judgment in favor of these defendants as to count 22. *See* Doc. 356 at 41. That decision renders moot the GTCR defendants' summary judgment motion insofar as it pertains to count 22.

### F. Count 23—"Tortious Interference with Contract"

Count 23 of the FAC again alleges tortious interference with contract by GTCR, Nolan, Rauner and Yih, but this time in connection with the Stockholder Agreements and the Purchase Agreement. *See* FAC (doc. 121) at 103, ¶¶ 482–485. The defendants are seeking summary judgment on this count in its entirety.

Plaintiffs did not respond with respect to the Purchase Agreement. By their silence the court assumes plaintiffs have abandoned this aspect of count 23. In any event, the court's ruling in *Mann I* dismissing plaintiffs' claim for tortious interference with the Purchase Agreement, mandates the conclusion that plaintiffs are not, and indeed cannot be, pursuing this aspect of count 23. *See Mann I* (doc. 72) at 31–33; and 69. In light of the foregoing, the court will next consider whether summary judgment is proper with respect to the remaining aspect of count 23—tortious interference with the Stockholder Agreements.

According to defendants, there are "two fundamental defects" with this tortious interference claim. Mot. (doc. 347) at 47. First, there was no underlying breach of the Stockholder Agreements; and in fact, plaintiffs have identified none. Defendants accurately note that when asked in an interrogatory to "[d]escribe with full particularity the factual basis" for this claimed tortious interference with the Stockholder Agreements, plaintiffs simply refer to the alleged breaches of fiduciary duty and the aiding and abetting of those duties. *See* Doc. 345, vol. 1, exh. 2 thereto at 26. In a conclusory manner, plaintiffs go on to state that such conduct "contributed to the destruction of LeapSource and of the value of the Individual Plaintiffs' interest in LeapSource acquired pursuant to the Stockholder Agreements, which denied the Individual Plaintiffs the benefit of what they had bargained for under those [A]greements." *Id.* Although phrased slightly differently, this is plaintiffs' response to defendants' summary judgment motion as well. Nowhere, for example, do plaintiffs specify any particular clause in the Stockholder Agreements which defendants allegedly breached.

The second "fundamental defect" here, from defendants' standpoint, is that there was no " 'improper' interference" with the Stockholder Agreements. Mot. (doc. 347) at 48. As plaintiffs' answers to interrogatories show, and their motion response confirms, this purported improper interference is predicated solely upon defendants' alleged breaches of fiduciary duties. *See* Doc. 345, vol. 1, exh. 2 thereto at 26; *see also* Resp. (doc. 417) at 40 ("The other wrongful conduct alleged in the FAC, including the breach of fiduciary and other duties . . . , will satisfy the requirement of . . . 'improper' conduct.") Defendants reason, however, that because plaintiffs have not shown any such breaches on this record, they cannot meet their burden of proving "improper conduct," a necessary element of a claim for tortious interference with contract.

Putting aside for the moment the issue of "improper conduct," the parties have opposing views as to whether a breach of contract must be shown to prevail on this tortious interference claim. Defendants vigorously maintain that prove of a breach is essential to a claim of tortious interference with contract. *See* Reply (doc. 449) at 30. On the other hand, plaintiffs contend that "the law does not necessarily require that the contract be breached." Resp. (doc. 417) at 39. Rather it is enough, they believe, to show that "a contract *relationship* has been *destroyed* by wrongful interference[.]" *Id.* (emphasis added).

The flaw in plaintiffs' argument is that they are conflating two distinct causes of action—tortious interference with contract and tortious interference with a business relationship. *See Southern Union Company v. Southwest Gas Corporation,* 180 F.Supp.2d 1021, 1047 n. 41 (D.Ariz. 2002) (although the elements are "virtually identical ... a claim for tortious interference with *contract* is distinct from a claim of tortious interference with a *business relationship*"). Plaintiffs specifically designated count 23 of the FAC as "tortious interference with *contract[.]*" *See* FAC (doc. 121) at 103 (emphasis added). They have never defined this tortious interference claims as anything other than being contract based, as is evidenced in part by the court's discussion in *Mann I. See Mann I* (doc. 72) at 31–34. Despite the foregoing, now, for the first time, plaintiffs are attempting to recast this claim in terms of tortious interference with a business relationship, a claim distinct from tortious interference with contract. After roughly four years of litigation, a complaint which has been amended four times, and in response to a summary judgment motion, it is simply too late in the day for plaintiffs to change their theory of liability. *See Eagle v. American Tel. and Tel. Co.,* 769 F.2d 541, 548 (9th Cir.1985) (finding that "[i]t would be unfair to the defendant to permit the plaintiff" to articulate a new damage theory for first time in summary judgment motion when that theory was not mentioned in the pre-trial status conference order or in the original or amended complaints). Therefore, the court grants defendants' motion for summary judgment as to count 23.

For the reasons set forth above, except as previously discussed, the court finds that none of the defendants breached the fiduciary duties of loyalty and due care which, undisputably, are the touchstone of corporate governance. At the end of the day, it appears that plaintiffs were displeased because at nearly every step of the way, from negotiating the original Purchase Agreement, to the wind-down operations, defendants chose to "play hard ball." Undoubtedly it would have been preferable to plaintiffs if defendants had comported themselves with an "[a]spirational ideal of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of ... corporate law[.]" *See Disney,* 907 A.2d at 745 n. 399. Such ideals, as the *Disney* Court stated so well, are "highly desirable often tend[ing] to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability." *Id.* At the same time though, those "aspirational ideals ... are not required by the corporation law and do not define the standards of liability[.]" *See id.*

### Conclusion

IT IS ORDERED that the motion for summary judgment by defendants GTCR Golder Rauner, L.L.C., GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR Associates VI, Joseph P. Nolan, Bruce V. Rauner, Daniel David A. Donnini and Philip A. Canfield (doc. 347) is GRANTED in part and DENIED in part, as hereinafter ordered.

IT IS FURTHER ORDERED that the motion by the GTCR Entity defendants for summary judgment as to count 2, "Breach of Fiduciary Duties By Majority Shareholders[,]" is GRANTED; except it is DENIED without prejudice to renew by appropriate motion to the extent count 2 alleges a breach of the duty of loyalty arising out of the ICG asset sale, and to the extent count 2 alleges a breach of the duty of due care.

IT IS FURTHER ORDERED that the motion by defendant GTCR for summary judgment as to count 4, "Aiding and Abetting Breach of Fiduciary Duties by Majority Shareholders and By Professional Advisers and Consultants[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion by defendants Nolan, Rauner, Donnini, and Yih for summary judgment as to count 5, "Breach of Fiduciary Duties By Directors and Officers[,]" is GRANTED; except it is DENIED without prejudice to renew by appropriate motion to the extent count 5 alleges a breach of the duty of loyalty arising out of the ICG asset sale.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR and the GTCR Entities for summary judgment as to count 6, "Aiding and Abetting Breach of Fiduciary Duties by Directors And Officers[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants the GTCR Entities, Nolan, Rauner, Donnini and Yih as to count 7, "Aiding and Abetting Breach of Fiduciary Duties By Professional Advisers and Consultants[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR, Nolan, Rauner, Yih and the GTCR Entities as to count 8, "Aiding and Abetting Fraudulent Transfers[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants Nolan, Rauner, Yih and the GTCR Entities as to count 9, "Trust Fund Doctrine[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR, Nolan and Rauner for summary judgment as to count 13, "Misappropriation of Trade Secret," is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants the GTCR Entities as to count 17, "Breach of Fiduciary Duty" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by the defendants GTCR, Rauner, Nolan, Yih, Donnini, and Canfield as to count 18, "Aiding and Abetting Breach of Fiduciary Duty[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by the defendants Nolan, Rauner and Yih as to count 19, "Breach of Fiduciary Duty[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR and the GTCR Entities as to count 20, "Aiding and Abetting Breach of Fiduciary Duty[,]" IS GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR, Rauner, Nolan, and Yih as to count 21, "Tortious Interference with Contract[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants the GTCR Entities for summary judgment as to count 22, "Breach of Purchase Agreement and Duty of Good Faith and Fair Dealing Arising from Purchase Agreement[,]" is DENIED as moot.

IT IS FINALLY ORDERED that the motion for summary judgment by defen-

dants GTCR, Nolan, Rauner, and Yih as to count 23, "Tortious Interference With Contract[,]" is GRANTED.